The document below is hereby signed.

Signed: November 24, 2020



_S. Martin Teel Jr._
S. Martin Teel, Jr.
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

In re                           )
                                )
STUART MILLS DAVENPORT,         )      Case No. 15-00540
                                )      (Chapter 13)
            Debtor.             )
                                )
                                )

MEMORANDUM DECISION RE DEBTOR'S
MOTION TO MODIFY PLAN AND SECURED CREDITORS'
APPLICATION FOR ALLOWANCE OF POSTPETITION FEES AND EXPENSES

Stuart Mills Davenport commenced this case as the debtor by
filing a voluntary petition under Chapter 13 of the Bankruptcy
Code (11 U.S.C.) on October 14, 2015.  He owns a property located
at  1700 1st Street, N.W., Washington, D.C. 20001 (the
"Property").[1]  Babak Djourabchi and Monica Welt hold a claim
against Davenport pursuant to a *Note* issued for $80,000.00 that
is secured by a *Deed of Trust* against the Property.  This
*Memorandum Decision* addresses Davenport's *Motion to Modify*

---

[1]  The Property is used for the Big Bear Café, but has a
residence on the second level.  The District of Columbia granted
the Property a secondary address of 105 R Street, N.W., on
September 19, 2006, for the R Street entrance that led to the
residence located on the second level of the Property.

*Chapter 13 Plan After Confirmation* (Dkt. No. 125) and the
*Application of Secured Creditors Babak Djourabchi and Monica
Welt, for Allowance and Payment of Interest, Costs, Fees and
Other Expenses Due on Secured Note* (part of Dkt. No. 137)
("*Application for Fees and Expenses*").

I

SUMMARY

On January 15, 2016, the court confirmed Davenport's amended
Chapter 13 plan, which called for Davenport to make payments of
$4,400.00 per month to the Chapter 13 trustee, and for the
trustee to pay Djourabchi and Welt's allowed secured claim (which
had to be fixed as of the date of confirmation), with
postconfirmation interest at 6% per annum on the amount of the
allowed secured claim.  In an order of July 21, 2016, the court
fixed the allowed secured claim of Djourabchi and Welt as
consisting of:

- the $80,000.00 of principal;

- plus amounts (not determined by the order) that were
  allowable under 11 U.S.C. § 506(b) as monetary
  obligations arising under the *Note* and the *Deed of
  Trust* after the commencement of the case and before
  confirmation of the plan;

- less a credit of $26,422.90 on hand as of the petition
  date.

2

The *Note* and *Deed of Trust* governed Davenport's debt
obligations up to the point of confirmation.  Under the terms of
the *Note*, the $26,422.90 credit could not be applied to the
$80,000.00 principal amount of the *Note* during the period
preceding confirmation because the *Note* had not been paid in
full.[2]  However, pursuant to 11 U.S.C. § 1325(a)(5)(B), the
confirmed plan altered Djourabchi and Welt's rights and thereby
permitted application of the $26,422.90 credit to be applied as
of the confirmation date in fixing the amount of the allowed
secured claim remaining at the conclusion of that date.

On January 17, 2017, Davenport filed a *Motion to Modify
Chapter 13 Plan After Confirmation* (Dkt. No. 125), contending
that he had submitted to the Chapter 13 trustee sufficient funds
to satisfy the allowed secured claim, and seeking (based on a
reduced income) to modify the plan by reducing his remaining
monthly plan payments to $1,425.00 per month, an amount
sufficient to satisfy the only other allowed claim in the case, a
claim of the Internal Revenue Service ("IRS").  Djourabchi and
Welt opposed the *Motion to Modify* and filed their  *Application
for Fees and Expenses* seeking allowance of fees and expenses for
which they had incurred liability postpetition (Dkt. No. 137).

---

[2]  The *Note* provided for interest only payments until the
*Note* was paid in full, with the result that any monthly payment
exceeding the amount of interest owed for the month became a
credit held in reserve.

They do not seek prepetition fees and expenses.

Under the *Deed of Trust*, upon being given notice of a payment of reasonable attorney's fees and expenses incurred by Djourabchi and Welt in protecting their secured position, Davenport became liable to reimburse Djourabchi and Welt for the amount of that payment. It was only after confirmation of Davenport's Chapter 13 plan that Djourabchi and Welt gave Davenport notice of payments of any of the attorney's fees and expenses at issue, and thus Davenport incurred a reimbursement obligation regarding the fees and expenses only after confirmation of his plan, and therefore the amounts owed pursuant to that reimbursement obligation are not part of the allowed secured claim (fixed as of the confirmation date). Nevertheless, the claims in that regard remain debts secured by the *Deed of Trust*, and had a potential impact on the debtor's performance under his confirmed plan, such that the court had subject matter jurisdiction to adjudicate the amounts owed.

The court issued a scheduling order regarding the litigation of the *Motion to Modify* and the *Application for Fees and Expenses*. The claim was oversecured. Accordingly, under 11 U.S.C. § 506(b), the allowed secured claim included:

- postpetition interest accruing prior to confirmation at the *Note* rate of 10.5% per annum on the $80,000.00 of principal; and

4

• any fees and expenses for which Davenport incurred a

   reimbursement obligation between the filing date of the

   petition and the confirmation date.

There were, however, no such reimbursement obligations incurred

during the postpetition period prior to the date of confirmation.

In a *Memorandum Decision and Order re Motions in Limine* of

September 11, 2017 (Dkt. No. 168) ("*In Limine Decision*"), the

court found that the amount of the allowed secured claim (fixed

as the confirmation date) was $55,717.03 (consisting of the

$80,000.00 of principal, plus postpetition interest of $2,139.93,

less the credit of $26,422.90).

   For reasons set forth below, I conclude with respect to the

*Motion to Modify* that under the modified plan more than

sufficient funds will be available to complete payment of the

allowed secured claim (and the postconfirmation interest thereon)

plus the IRS's claim.  Accordingly, I will grant Davenport's

*Motion to Modify*.

   As to Djourabchi and Welt's *Application for Fees and

Expenses*, I will reject Davenport's attempt to have the court

deny all of the claim for reimbursement of payments of attorney's

fees and expenses.  However, under District of Columbia law,

which governs the reasonableness of amounts incurred as a

reimbursement liability after the date of confirmation, the fee

and expense amounts incurred in the bankruptcy case and for which

reimbursement is sought are in large part unreasonable.[3]

Finally, I conclude that with respect to Davenport's obligation to reimburse Djourabchi and Welt for any payment of reasonable attorney's fees and expenses, Davenport is required to pay interest at the *Note* rate of 10.5% per annum from the date of notice that the payment had been made.

## II

## FACTS

The history of this case is extensive, but essential to understanding the issues being considered, especially Davenport's defenses to postconfirmation attorney's fees and expenses.  The pertinent facts are set forth below.

## A

## THE *NOTE* AND THE *DEED OF TRUST*

On September 22, 2006, Davenport executed the *Note* (titled *Promissory Note for Business and Commercial Purposes*) and the *Deed of Trust* in favor of Djourabchi and Welt, who were his neighbors, for a loan of $80,000 secured by the Property.  The Property was already subject to an existing first deed of trust in favor of Bayview Loan Servicing, LLC ("Bayview").  The *Note* was drafted by Djourabchi, an attorney, although his usual legal

---

[3]  For the reasons stated in the *In Limine Decision*, I will not consider whether Djourabchi and Welt are entitled to reimbursement of attorney's fees and expenses incurred in a pending District Court civil action, a question it is premature to decide.

work did not encompass the drafting of promissory notes.  Several

provisions of the *Note* and the *Deed of Trust* are significant to

the questions at hand.  The *Note* provides in part:

> 1.    <u>Secured Interest and Right to Record</u>.
> Debtor acknowledges that his ownership and financial
> interest in certain real property situated in the
> District of Columbia, and having a street address of 1700
> 1st Street, NW, Washington, DC 20001, is being offered as
> a security interest for the balance of principal and
> interest on this Note.  . . .  Such a lien on the Deed
> shall be released, if and only if all outstanding debts
> from this instrument, including but not limited to all
> accrued interest and fees, have been paid in full to the
> satisfaction of Creditor.
>
> 2.    <u>Payments of Interest and Fees</u>.  All payments
> are due by 5:00 PM on the first calendar day of each
> month.  Debtor understands and acknowledges that he has
> requested to make interest-only payments to Creditor, and
> Creditor has made this Promissory Note in full reliance
> of the same—therefore, monthly payments shall remain
> interest-only for life.  Interest is calculated on a
> monthly basis accruing on the first calendar day of each
> month, at 9:00 AM, and will not be prorated for a daily
> calculation for any rason.  Any consideration for
> prepayment shall include interest for the entire calendar
> month in which the prepayment is scheduled to be made.
>
> <u>Method of Payments</u>.  Any and all payments by Debtor,
> including, but not limited to prepayments of principal,
> interest, or any other amounts of any kind with respect
> to this Promissory Note shall be made in immediately
> available funds by Debtor to Creditor and shall be
> deposited directly at Citibank . . . or in such other
> means and at such other addresses as Creditor shall
> direct from time to time, on or before the due date and
> without any prior demand, i.e., without any type of
> billing, invoicing or notice.  Debtor understands and
> accepts that it is Debtor's sole and absolute
> responsibility to ensure that any and all payments are
> made on time and in Creditor's possession when due.  Any
> payments of amounts due hereunder shall be in such
> currency of the United States at the time of payment as
> shall be legal tender for the payment of public or
> private debts.

3.   <u>Maturity Date</u>.  The Principal Balance and all Interest and Fees shall be due and payable on September 22, 2016.

4.   <u>Prepayment</u>. For Debtor to prepay this Promissory Note in full prior to the Maturity Date, Debtor must deliver to Creditor notice of intent to prepay at least 20 (Twenty) days in advance of Debtor's intended date of prepayment ("Notice of Prepayment"). With successful delivery of Notice of Prepayment to Creditor, Debtor may prepay this Promissory Note in whole, but only in whole, together with any accrued interest.  No partial payments shall be accepted.  If there is a conflict between the provisions of this Paragraph and any other terms and conditions outlined in this instrument, this Paragraph shall be subordinate to all others.  Notice of Prepayment will expire if prepayment is not made on the date stated therein.

5. <u>Default; Remedies</u>.

(a) Any failure by the Debtor to make any payment of principal, interest or any other charge, fee or payment due hereunder when the same becomes due and payable, whether by demand, acceleration, or otherwise, and the continuation of such failure for a period of 4 (four) calendar days shall constitute a default.

(b) Upon the occurrence of a Default, Debtor understands and acknowledges that Creditor, without any notice; shall have the following additional rights and freedoms, separate arid apart from any other rights outlined in this instrument:

(i) Proceed in foreclosure on the secured interest held by Creditor;

(ii) File a notice of default with credit rating agencies of choice;

(iii) Collect a compound penalty of $10 (Ten Dollars) per calendar day, separate and apart from any ongoing amounts due under this instrument.

Creditor shall have the right and freedom to pursue any and all such rights, as well as others allowed by-law, until all outstanding payments are made in full to the satisfaction of the Creditor.

8

6.   <u>Application of Payments</u>.  Creditor shall have the sole, exclusive, and unreviewable right to, unilaterally and without notice to or the consent of any person, allocate any and all payments which may be received by or tendered to Creditor made by Debtor or any other person at any time or from time to time and which relate in any way to the sums promised hereunder, including: (i) the payment of any costs and expenses incurred by Creditor to enforce any rights hereunder; (ii) accrued but unpaid interest, and all other charges, fees or payments due hereunder; and (iii) principal.

\* \* \*

9.   <u>Waiver</u>.

(a)        Debtor, for himself and for his successors, hereby irrevocably: (i) waives diligence, presentment and demand for payment, protest, notice, notice of protest and nonpayment, dishonor and notice of dishonor and any other demands or notices of any and every kind whatsoever, . . . .

The *Deed of Trust* also has several key provisions that are important to this case.  The *Deed of Trust* provides in relevant part:

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property.  Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security

9

Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. . . .

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

* * *

**11.   Assignment of Miscellaneous Proceeds; Forfeiture.** . . .

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

* * *

**14.   Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees . . . .

**19.   Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property

10

pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged.  .  .  . Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred.  .  .  .

    *  *  *

    **22.  Acceleration; Remedies**.  Lender shall give notice to Borrower prior to acceleration following Borrower's default or breach of any covenant or agreement in this Security Instrument . . .  The notice shall specify (a) the default; (b) the action required to cure the default (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of sums secured by  this Security Instrument and sale of the Property.  The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of borrower to acceleration and sale.  If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by applicable Law.  Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to,

reasonable attorneys' fees and costs of title evidence.

At the time Davenport executed the *Note* and *Deed of Trust*, he lived in a residence at 1710 1st Street, N.W., Washington, D.C. 20001 ("1710 Residence"), adjoining the Property (located at 1700 1st Street, N.W.). Davenport moved into a residence on the second floor of the Property sometime in 2012, and lived there until sometime around May 2017, when he moved back into the 1710 Residence.

B

DAVENPORT'S FIRST BANKRUPTCY CASE

Davenport was already in financial difficulty in 2006 when he entered into the loan arrangement with Djourabchi and Welt. Within a year, in 2007, Davenport defaulted on the first mortgage on the Property held by Bayview. Djourabchi and Welt demanded that Davenport pay the full amount of the loan owed them by September 2008, or they would foreclose on the loan or sell the loan to a more aggressive lender. However, Djourabchi told Davenport that if he increased payments from $700 per month to $1,000 per month, Djourabchi and Welt would not foreclosure. Davenport could not fully pay the *Note*, so he began paying $300 extra each month towards paying the *Note*, which was acceptable to Djourabchi and Welt, to prevent any foreclosure. Davenport was not represented during this exchange and did not consult legal counsel until sometime in May 2009.

12

Davenport again went into default on the first mortgage held

by Bayview in 2008.  Djourabchi sent Davenport an email on August

18, 2009, which read:

> Please coordinate a time to meet with me today before
> 3:30 PM, so that this loan could be paid in full.  I need
> to meet before 4:00 PM in order to make sure that the
> check is deposited in the proper account.  The remainder
> of this email is reasonable notice, should the debt
> remain unsatisfied as of today.
>
> I recognize that you were in touch with me yesterday.
> However, you were not able to meet yesterday.  I called
> you this morning, and you did not take may call.  The
> outstanding debt has not been paid as of this time.
> Please remember, that as of today, you are in default on
> this loan.  By the terms and conditions of the secondary
> lien on your property, ANY act of default on ANY debt
> owed by you constitutes a breach and immediate
> acceleration of all debts owed.  Therefore, my next step
> is to engage my attorney (Russell Drazin) for the service
> of executing an acceleration and the possible subsequent
> foreclosure of the subject property.  Additionally,
> please remember that any retainer and all associated fees
> having to do with preparing for and hiring an attorney to
> enforce the terms and conditions of your loan(s) become
> your responsibility.

The record is unclear what default on "any debt owed by

[Davenport]" was the basis for treating the *Note* as being subject

to acceleration.  In any event, Drazin never issued a notice of

acceleration before Davenport filed his first bankruptcy case

which, pursuant to the automatic stay of 11 U.S.C. § 362(a),

stayed any act to foreclose on the Property.

Davenport filed a voluntary petition in this court

commencing his first case under Chapter 13 of the Bankruptcy Code

(Case No. 09-00772) on September 2, 2009, to address a large

amount of unsecured claims as well as a mortgage on the 1710 Residence, which was in arrears, and the two deeds of trust on the Property.  Davenport successfully dealt with Bayview and the 1710 Residence mortgagee in that case.  Djourabchi and Welt filed a proof of claim in that case alleging a claim for only $80,000 under the *Note*, but not claiming any prepetition arrearages, thereby violating Fed. R. Bankr. P. 3001(c)(2)(B) (requiring that a secured creditor include with its proof of claim "an itemized statement of the interest, fees, expenses, or other charges" incurred prepetition).[4]  Davenport assumed that there were no arrears claimed by Djourabchi and Welt to be owed.  Accordingly, with there being no arrears claimed with respect to the *Note*, Davenport filed a plan, which was subsequently confirmed, that called for Davenport to make direct payments toward Djourabchi and Welt's claim.  In 2012, however, Djourabchi and Welt informed Davenport that attorneys' fees of $3,000.00 were owed.  Davenport did not attempt to modify his plan to deal with paying those fees, and he completed his plan in April 2015.  Davenport made his final plan payment on January 20, 2015.

Under the terms of the *Note*, Djourabchi and Welt were entitled to a $10 penalty for each day there was a late payment of a monthly payment of interest (with each month treated as a

---

[4]  Djourabchi and Welt filed a total claim of $94,146.75 that included an unsecured claim of $14,146.75 for amounts owed on an unrelated $10,000 promissory note that came due in 2009.

30-day period, so that for an entire month the penalty was $300).

Before the conclusion of Davenport's first bankruptcy case,

Djourabchi and Welt advised Davenport that he had incurred late

fees.  On March 12, 2015, Davenport filed a motion to show cause

why Djourabchi and Welt ought not be held in civil contempt for

having notified Davenport that he owed penalty amounts for

allegedly making late payments.  On March 24, 2015, Djourabchi

and Welt filed an opposition attaching thereto their computation

of penalties that had accrued.  At a hearing of May 15, 2015, the

court ruled that any notification regarding penalties that had

allegedly accrued was not a violation of the automatic stay of 11

U.S.C. § 362(a).[5]

Davenport obtained a discharge on June 26, 2015.  On July

15, 2015, he filed a *Revised Motion to Determine Final Cure and

Payment*.[6]  Briefing of that *Revised Motion* was completed on

September 8, 2015.[7]  On December 31, 2015, the court issued its

---

[5]  On June 5, 2015, the court entered an order denying the
motion to show cause, reflecting its ruling at the hearing of May
15, 2015.

[6]  The *Revised Motion* cured certain procedural deficiencies
in the initial *Motion to Determine Final Cure and Payment* filed
on July 9, 2015.

[7]  As will be seen, before the court decided the *Revised
Motion*, Djourabchi and Welt gave notice on September 15, 2015, of
a foreclosure sale set for October 20, 2015, and on October 14,
2015, Davenport commenced this bankruptcy case, Case No. 15-
00540.

decision regarding the *Revised Motion*.  *See In re Davenport*, 544
B.R. 245 (Bankr. D.D.C. 2015).  The court ruled that "[t]he
debtor's view of Rule 3001(c)(2)(D)(i) as permitting disallowance
of a claim based on a violation of Rule 3001(c)(2)(B) [for
failure of the proof of claim to list the amount in arrears] is
an erroneous view."  *Id.* at 250.  The court further held that it
did not have jurisdiction to adjudicate the amount of the debt
owed because the plan payments had been completed and Davenport
had received a discharge, such that there was no longer a plan to
administer.  The motion was characterized as a motion under Fed.
R. Bankr. P. 3002.1, but the court found that the version of Rule
3002.1 then in effect did not apply to the claim because the
claim was not provided for under 11 U.S.C. § 1322(b)(5) in
Davenport's plan.

C

DAVENPORT'S FIRST ATTEMPT TO PAY OFF THE *NOTE*

Sometime in 2009, the year his first bankruptcy case began,
Davenport sent an email to Djourabchi and Welt indicating that it
was his intention to pay off the *Note* by the end of his
bankruptcy case.  Davenport did not give a date upon which he
planned to pay off the *Note*.

Davenport testified in the trial of the *Motion to Modify*
that as his bankruptcy was coming to an end, he attempted to
discover the amount owed on the loan, but was not receiving

16

cooperation by Djourabchi and Welt.  He sent an email in 2012
asking Djourabchi and Welt how much was owed under the *Note*.
Then on October 21, 2013, Davenport's attorney, William F.
Markley, sent a letter to Djourabchi and Welt's attorney, Joel S.
Aronson, asking for a payoff statement within 30 days that would
be good through December 31, 2013, and noting: "In reviewing Mr.
Davenport's financial matters I noticed Mr, Davenport is paying
your client $1,000.00 monthly, even though the applicable Note
calls for payments of $700.00 monthly.  Is the additional $300.00
per month being applied towards principal?"  On November 20,
2013, Aronson responded by e-mail that: "The extra money has been
applied to late fees. The balance due is $83,450. Comprised of
$80,000 in principal and $3,450 in legal fees."  In response to a
further letter of November 3, 2014, from Markley, Aronson wrote
in a letter of November 17, 2014, that he disagreed with
Markley's calculation of the amount owed, and stated: "Mr.
Davenport has been in default status since his second payment
made in November 2006."  As will be seen, that was necessarily
based on an erroneous view, contrary to law, that payments of
interest were *due in advance* on the first of each month.

    There then ensued on March 12, 2015, Davenport's motion to
show cause why Djourabchi and Welt ought not be held in civil
contempt, and their opposition calculating the amount owed based
on their erroneous view that payments of interest were due in

17

advance on the first of the month.  When Davenport's motion was unsuccessful, Davenport calculated on his own what he believed was still owed under the *Note*.

On May 15, 2015 (the day of the hearing at which the court ruled against Davenport regarding his motion to show cause why Djourabchi and Welt ought not be held in civil contempt), Davenport wrote a check for $60,980 according to his calculation that $60,980 should suffice to satisfy the debt, with a note on the check stating "Loan Paid in Full."  On May 27, 2015, Davenport deposited the check into Djourabchi and Welt's bank account where Davenport made payments on the *Note*.  Davenport did not inform Djourabchi and Welt or their attorney that he was making a final payment.  Djourabchi and Welt learned of the deposit when they discovered a large sum in their bank account.

On June 16, 2015, Djourabchi and Welt's attorney, Aronson, sent Davenport's attorney, William Markley, a letter providing notice that Djourabchi and Welt were rejecting the payment because the amount was insufficient to pay the full amount of the debt.  The letter said in part:

> As laid out prior to the recent hearing in federal court, the late fees and outstanding payments that are owed are

substantial.[8]  My client has also incurred significant
legal fees enforcing the terms of the loan, including
those in the bankruptcy proceeding.

Attached to the letter was a check returning the full $60,980.

The letter concluded by stating: "If your client wishes to pay

the outstanding fees, costs, and late payments and/or outstanding

principle [sic] in advance of maturity, please advise so that I

can obtain a total payoff as of a date certain."   Then, in July

2015, Davenport (by then, represented by his current counsel,

Jeffrey M. Orenstein) filed his initial *Motion to Determine Final*

*Cure and Payment* and then his *Revised Motion to Determine Final*

*Cure and Payment* in an effort to obtain a ruling as to what

Davenport owed under the *Note*.  However, before the court

disposed of the *Revised Motion*, Djourabchi and Welt noticed up a

foreclosure sale and Davenport was forced to file his second

bankruptcy as a means of staying the foreclosure sale.

D

DAVENPORT'S SECOND BANKRUPTCY CASE

Djourabchi and Welt maintained that Davenport was still in

monetary default after he had completed his plan and obtained a

discharge.  On September 15, 2015, they issued a notice regarding

---

[8]  This was an apparent reference to the filing of March 24,
2015, in Davenport's first bankruptcy case (Case No. 09-00772,
Dkt. No. 300) which set forth amounts claimed to be owed in
opposing Davenport's to show cause why Djourabchi and Welt ought
not be held in civil contempt.  (The motion to show cause had
been heard and rejected by the court on May 15, 2015.)

a foreclosure sale of the Property set for October 20, 2015.  On
October 14, 2015, Davenport filed a second voluntary petition
commencing this chapter 13 bankruptcy case to obtain a stay under
11 U.S.C. § 362(a) of Djourabchi and Welt's foreclosure set for
October 20, 2015, and to address paying Djourabchi and Welt's
claim pursuant to a Chapter 13 plan.

At the time Davenport filed his second bankruptcy case,
Davenport only had one other significant debt besides his debt
under the *Note*.  Davenport's business, the Big Bear Café, had a
significant tax debt, a large part of which Davenport was
personally liable to pay by reason of 26 U.S.C. § 6672 as a
responsible officer; however, the tax debt was being addressed by
Davenport's business in discussions with the Internal Revenue
Service and was not causing Davenport financial difficulty.
Davenport's initial Chapter 13 plan called for curing arrears on
Djourabchi and Welt's claim and for Davenport to maintain monthly
contractual payments.[9]  On November 9, 2015, Djourabchi and Welt
filed a proof of claim in the amount of $121,813.88, consisting
of:

    $80,000.00 - Loan Principal

    $12,682.97 - Late fees, etc.

---

[9]  Nevertheless, in the bankruptcy case, the IRS's claim, as
a priority claim under 11 U.S.C. § 507(a)(8)(C), was one that
Davenport was required under 11 U.S.C. § 1322(a)(2) to pay under
any plan unless the IRS agreed to a different treatment.

$29,130.91 - Legal Fees, etc.

Djourabchi and Welt further listed the full $121,813.88 as in arrears.  On November 13, 2015, Djourabchi and Welt filed a motion to dismiss the case, and on November 30, 2015, they filed an objection to confirmation of the debtor's initial proposed plan.  On December 14, 2015, Davenport filed an amended plan calling, as permitted by 11 U.S.C. §§ 1322(c)(2) and 1325(a)(5), for the entire debt owed to Djourabchi and Welt to be paid off in full with postconfirmation interest of 6% per annum.[10]  The amended plan read in relevant part:

> B.  **11 U.S.C. §1322(b)(5) CLAIMS** (FINAL PAYMENT UNDER THE PLAN BEING TREATED AS DUE 60 MONTHS FROM PETITION DATE): THE DEBTOR SHALL MAINTAIN POST-PETITION PAYMENTS DIRECTLY WHILE CASE IS PENDING AND THE TRUSTEE WILL CURE ALL PRE-PETITION ARREARS, COSTS, AND FEES OF THE FOLLOWING CLAIMS:
> -- WITH FULL 100% PAYMENT:
>
> **NONE**
>
> -- WITH FULL 100% PAYMENT PLUS 6% POST-CONFIRMATION INTEREST PER ANNUM:
>
> **NONE**
>
> * * *
>
> D.  **ALL REMAINING CLAIMS:** FULL 100% PAYMENT PLUS 6% POST-CONFIRMATION INTEREST PER ANNUM
>
> **THIS INCLUDES THE ALLOWED CLAIM OF DJOURABCHI/WELT**

Djourabchi and Welt objected to the amended plan, reiterating the

---

[10]  On December 16, 2015, the Clerk docketed a photocopy of that amended plan, and docketed it as a second amended plan.  In reality, there was only one amended plan.

grounds asserted in support of dismissal and erroneously asserting that the claim could not be modified as provided by the amended plan.  On December 30, 2015, Davenport filed an objection to Djourabchi and Welt's proof of claim.  (As will be seen, after a two-day trial ending on July 7, 2016, the court decided that objection on July 21, 2016.)

On January 15, 2016, the court held a hearing on Djourabchi and Welt's motion to dismiss and their objection to confirmation of the amended plan.  Djourabchi and Welt contended that this case was nothing more than a two-party dispute between Davenport and Djourabchi and Welt and that Davenport claimed to be living on the Property, but was not.  Djourabchi and Welt also objected to confirmation of the plan because Davenport was not treating their secured claim, on property he claimed was his principal residence, only under 11 U.S.C. § 1322(b)(5).  I denied Djourabchi and Welt's motion to dismiss and overruled their objection to the plan.  At the hearing, I ruled:

> This is a hearing on confirmation of the debtor's plan.
> The objections that have been raised to confirmation are
> overruled.  The Debtor is entitled to invoke Section
> 1322(c)(2), which means that he may invoke Section
> 1325(a)(5), and the Plan provided for a treatment in
> accordance with Section 1325(a)(5), namely that the
> secured claim will be paid off over time in equal monthly
> payments, with an interest rate designed to get present
> value.

On January 15, 2016, the court issued an order, confirming the plan, which said in part:

22

      1.  Once  the  objection  to  the  claim  of  Babak
Djourabchi  and  Monica  Welt  is  decided,  the  payments  to
them  under  the  plan  shall  be  based  on  the  court's
determination  of  the  amount  owed  them  as  of  the  date  of
entry of this order confirming the debtor's plan.

      2.  Until  the  objection  to  claim  is  decided,  the
trustee  shall  make  monthly  distributions  to  Babak
Djourabchi  and  Monica  Welt  equal  in  amount  to  (or
exceeding) the minimum monthly payment due them under the
plan based on the amount owed them as of the date of
entry of this order pursuant to their proof of claim (as
though  no  objection  to  claim  had  been  filed)  but  such
payments  in  the  aggregate  shall  not  exceed  the  $52,000
amount the debtor concedes is owed on that claim.

What this meant was that after confirmation and in the interim
before the court disposed of the objection to claim, the trustee
could make payments based on the proof of claim, but ultimately
the payments to which Djourabchi and Welt were entitled would be
based on what was owed pursuant to the amount of the allowed
secured claim as of the confirmation date.  No party sought a
review of the order or filed a notice of appeal.

    The court also denied Djourabchi and Welt's motion to
dismiss finding no bad faith: Davenport indeed was living at the
Property; Davenport had not been informed until late in the first
bankruptcy case regarding alleged arrears claimed by Djourabchi
and Welt; and Davenport had filed the second bankruptcy to
challenge the alleged arrears (which, as will be seen, did not
actually exist) and to address paying the claim in a manner
authorized by the provisions of Chapter 13.

    On May 24, 2016, the court commenced trial on the claim

objection, and the second day of trial was on July 7, 2016.  A

principal and critical issue was whether the *Note* required

Davenport to pay interest in advance.  Djourabchi and Welt's

position on that issue was without substantial merit, and totally

unreasonable.  The court ruled:

> The Promissory Note did not alter the ordinary custom, to
> which Davenport's expert witness testified, that, absent
> a clear contractual provision to the contrary, interest
> is paid for a month after the expiration of that month to
> which the interest relates.  As established by
> Davenport's expert witness, this Promissory Note did not
> comply with the commercial custom and practice that
> prevails when a note calls for payment of interest in
> advance.  Although Djourabchi and Welt attempted to
> present contrary expert witness testimony, that witness's
> testimony was unpersuasive even if he could be deemed to
> have qualified as an expert witness.
>
> When a commercial loan is intended to have the full
> amount of interest that will accrue for a month paid in
> advance at the start of the month, the custom and
> practice is to so state in clear terms in the promissory
> note.  This Promissory Note failed to do that.  It makes
> no provision that interest is to be paid in advance.
>
> As stated in 45 Am. Jr. 2d, [Interest & Usury] Sec.
> 28 (1999) (citing *Owens v. Graetzel*, 126 A. 224 (Md.
> 1924)):
>
>> To make interest payable in advance, the intention
>> to do so should be expressed in unambiguous and
>> unmistakable language, and when an ambiguity in a
>> contract calling for interest exists, so that it is
>> not clear whether the interest is payable in
>> advance, the interpretation least favorable to the
>> one drawing up the contract will be adopted.
>
> *See also BTD-1997-HHC LLC v. Cathedral Park Partnerships*,
> 760 So. 2d 1036 (Fla. Dist. Ct. App. 2000).  The
> Promissory Note failed to express in unambiguous and
> unmistakable language that the payment of interest due on
> the first of each month was to be a payment in advance of
> interest. Accordingly, absent extrinsic evidence showing

24

otherwise, interest was not to be paid in advance.
*Memorandum Decision re Debtor's Objection to the Proof of Claim
Filed by Babak Djourabchi and Monica Welt* of July 21, 2016 (Dkt.
No. 109) ("*Proof of Claim Decision*").  Davenport's expert
witness, Runge, correctly treated interest as payable in arrears.
Based on that treatment of interest, and the payments that had
been made, Runge concluded that Davenport was never in monetary
default and made an overpayment of $26,425.87 (and with the
correction of a slight error in Runge's calculation, the
overpayment was $26,422.90).  Djourabchi and Welt called Dimitri
Velin, an accountant, as a witness, who attempted to testify that
the *Note* called for interest to be in advance, but as explored
later, his testimony was baseless and the court gave no weight to
his testimony.  The court found that the *Note* did not require
that interest be paid in advance, and agreed with Davenport
regarding payments that had been made.  The court concluded that,
as a consequence, Davenport had never been in arrears, and in
fact, had made payments ahead of time and stayed on top of his
payments.  The court agreed with Runge that Davenport had
overpaid on the *Note*, and except for a miscalculation of $2.97,
substantially adopted Runge's testimony.

The court held in favor of Djourabchi and Welt that the *Note*
anticipated all payments made under the *Note* would be interest
payments, and no payments would be made on the principal, unless

25

the principal was paid in full.  "[E]xcess payments would be held
in reserve as credit to be applied towards obligations that came
due in the future."  *Proof of Claim Decision* at 3-4.  The
consequence was that the credit on hand on the petition date
could not be applied until the plan was confirmed.

As noted above, Djourabchi and Welt's proof of claim filed
on November 9, 2015, asserted that "Legal fees, etc." of
$29,130.91 were owed on the petition date.  The court denied
recovery of attorney's fees and expenses as part of Djourabchi
and Welt's proof of claim as of the petition date because, *inter
alia*, there was no showing that there was a monetary default
justifying charging prepetition legal fees to Davenport and
"Djourabchi and Welt failed to provide the detailed types of time
records that are required in order to determine reasonable fees
that Davenport was obligated to pay."  *Proof of Claim Decision* at
18-19.

The bankruptcy court's task was to fix the amount owed as of
the petition date: no motion had been filed by either party to
determine the amount of postpetition amounts allowable under

§ 506(b).[11]   Accordingly, the court ordered:

> that the claim of Djourabchi and Welt is allowed in the
> amount of $80,000 as of the commencement of this case,
> with a credit in favor of the debtor of $26,422.90 for
> interest accruing after the commencement of the case (or
> for payment of other components of the allowed claim),
> and the claim of Djourabchi and Welt is otherwise
> disallowed, except with respect to amounts allowable
> under 11 U.S.C. § 506(b) incurred after the commencement
> of the case.

*Order re Debtor's Objection to the Proof of Claim Filed by Babak Djourabchi and Monica Welt* entered July 21, 2016 (Dkt. No. 110) ("*Proof of Claim Order*") at 1-2.  In other words, the *Order* left open the question of "amounts allowable under 11 U.S.C. § 506(b) after the commencement of the case."

E

THE DISTRICT COURT CASE

On December 15, 2016, after the court entered the *Proof of Claim Order*, Davenport filed a civil action in the U.S. District Court for the District of Columbia against Djourabchi and Welt asserting claims of wrongful foreclosure, breach of contract, violation of D.C. interest and usury laws (D.C. Code §§ 28-3301, et seq.), and tortious interference with business relationship.

---

[11]   In hindsight, in order to fully fix the amount of the allowed secured claim to be paid under the plan, the court's pretrial order ought to have required the parties, in the trial of the objection to claim, to address not only the amount owed on the petition date but also the amounts allowable under § 506(b): (1) the amount of postpetition interest accruing before confirmation, and (2) the amount of Davenport's obligations, incurred postpetition and prior to confirmation, to reimburse Djourabchi and Welt for payments of attorney's fees and expenses.

The District Court dismissed the action on November 11, 2017, based on res judicata because Davenport had failed to raise these claims in his objection to the proof of claim in the bankruptcy case. Davenport filed a motion to reconsider. The District Court granted the motion to reconsider on June 12, 2018, and vacated the dismissal of the action. That action (Case No. 1:16-cv-02445-ABJ-RMM) is still pending.

F

THE MOTION TO MODIFY

In this second bankruptcy case, Davenport indicated to the trustee that he wanted to completely pay off Djourabchi and Welt's claim through a lump sum payment. The trustee calculated $31,474.50 to be the amount owed under the *Note*, finding that no section 506(b) motions for attorney's fees had been filed, and gave that number to the debtor. Davenport made a payment to the trustee in January 2017, sufficient to permit a distribution of $31,474.50 to Djourabchi and Welt. The trustee distributed $31,474.50 to Djourabchi and Welt on January 31, 2017.

Davenport filed a *Motion to Modify Chapter 13 Plan After Confirmation* (Dkt. No. 125) on January 17, 2017, asserting that he had made payments to the trustee that satisfied the allowed secured claim. Djourabchi and Welt objected to the *Motion to Modify* on the basis that they did not agree that the full debt had been paid. In their February 22, 2017 *Supplemental*

28

*Opposition* (Dkt. No. 137)[12] to the *Motion to Modify*, they asserted for the first time that they were owed postpetition attorney's fees of $51,803.00 and expenses of $9,929.10, through December 31, 2016, as well as fees and expenses related to Davenport's civil action against Djourabchi and Welt in the District Court.  They also challenged the Davenport's calculation of postpetition interest.  The matter was put on schedule for trial.

In preparation for the trial, Davenport filed two motions in limine.  The first motion, titled *Motion In Limine Prohibiting Creditors From Claiming Entitlement to Attorney's Fees*, requested a court ruling that prohibited Djourabchi and Welt from claiming attorney's fees, contending that Djourabchi and Welt did not have a right to attorney's fees under the *Note* and that, in any event, the doctrine of res judicata barred such attorney's fees because the court had already denied recovery of Djourabchi and Welt's attorney's fees in its *Proof of Claim Decision*.  The second motion, titled *Motion In Limine Regarding Interpretation of Court's Orders and Application of Payments Made on Account of Creditors' Claim*, requested a ruling on the application of the

---

[12] Djourabchi and Welt first filed a short opposition (Dkt. No. 131) opposing the *Motion to Modify* on the basis that "the entire Note balance including applicable post-petition charges has not yet been paid in full," and then later filed the *Supplemental Opposition*, which included the *Application for Fees and Expenses* seeking post-petition charges.

$26,442.90 credit.  Djourabchi and Welt opposed the motions in limine.

The court ruled on the motions in limine on September 11, 2017.  As to the *Motion In Limine Prohibiting Creditors From Claiming Entitlement to Attorney's Fees*, the court held that the *Note* and *Deed of Trust* did give Djourabchi and Welt a right to attorney's fees associated with the bankruptcy case, and that the *Proof of Claim Order* did not have res judicata effect with respect to attorney's fees asserted as part of the allowed secured claim pursuant to 11 U.S.C. § 506(b), which the *Proof of Claim Order* expressly did not disallow.  However, believing that no attorney's fees had been invoiced by the confirmation date, the court determined that Davenport did not have any obligation to reimburse Djourabchi and Welt for attorney's fees as of the confirmation date, and that, accordingly, the allowed secured claim (fixed as of the date of confirmation) did not include any attorney's fees.  *In Limine Decision* (Dkt. No. 168) at 26. However, as to the District Court litigation, the court held:

> The issue as to whether the creditors are entitled to attorneys' fees in the District Court case is a little more complicated.  The debtor contends that the creditors are not enforcing the agreement, nor are they protecting their interest in the property or rights under the agreement in the District Court case.  In the District Court, the debtor is claiming the creditors acted against his rights under the agreement and in the process have committed certain torts and violated certain legal duties.  However, in defending against the debtor's allegations, the creditors are in fact defending their rights under the agreement.  Should the creditors

30

prevail, they would retain certain rights that are being
scrutinized by the court.    Therefore, should the
creditors prevail in their case, they would have a right
to attorneys' fees applied to their claim as such fees
will have been incurred in a legal proceeding that might
significantly affect their rights under the Deed.

On the other hand, should the creditors lose, then
the agreement clearly did not grant them such rights, and
the creditors violated their duties under the agreement.
Further, to allow the creditors to claim attorneys' fees
when they lose such a case would be contrary to public
policy and would be denied on that ground.   In that case,
they should not be permitted to collect attorneys' fees
for defending rights they never had.   Accordingly, they
must also be the prevailing party.   *See Carter*, 947 A.2d
at 1159 ("[t]he prevailing party may recover fees and
costs from the losing party if authorized by statute, by
contract, or by the court's exercise of equitable power
when the interests of justice so require." (internal
quotes deleted)).   As the District Court case is still
pending, I will set that aspect of this matter aside to
be further decided when that case is resolved.

*In Limine Decision* at 12-13.[13]   It is therefore premature to

address attorneys' fees incurred in the District Court.

As to the *Motion In Limine Regarding Interpretation of*

*Court's Orders and Application of Payments Made on Account of*

*Creditors' Claim*, Djourabchi and Welt contended in a filing of

July 21, 2017, that "(1) that the Plan required equal monthly

---

[13]   The *In Limine Decision* could be read as overstating one
thing.   Nowhere in the *Note* or the *Deed of Trust* are attorney's
fees dependent upon Djourabchi and Welt prevailing in a
proceeding.   In the *In Limine Decision,* the court was not
establishing a rule that placed prevailing in the action as a
prerequisite to an award of attorney's fees.   However, a ruling
in favor of Davenport in the District Court that there was no
right to foreclose would establish that Djourabchi and Welt had
no interest to protect, and they would not be entitled to
attorney's fees.

plan payments to Creditors that would not reduce principal due until the principal was paid in full; and (2) that interest would continue to accrue on the full $80,000.00 in principal due to Creditors until enough payments had been made to Creditors to completely and fully pay all costs, expenses and fees then due, as well as payment of principal in full." The court rejected that argument. The court held that as of the confirmation date, the *Note* was treated as matured under the plan, which meant that the plan payments would be amortized and be applied to interest, fees **and principal**, and there was no longer a balloon requirement to pay the principal in one lump sum payment.

The court further held that as of the petition date, Davenport was not in arrears, and interest had been paid. The court calculated the interest accruals between the petition date and the confirmation date, and determined that as of the confirmation date of January 15, 2016, Davenport owed Djourabchi and Welt $55,717.03. *Mem. Dec.* at 26-27.

The *Motion to Modify* continued to trial ending on March 1, 2018. At the trial, the court heard testimony from two expert witnesses and from the new standing Chapter 13 trustee regarding the amount that was owed to Djourabchi and Welt. An issue arose as to whether the parties had stipulated with the trustee at the confirmation hearing that during the pendency period between the petition date and the date of confirmation, interest would be

32

calculated at 6% on the original claim amount of $121,813.88,
without adjustment of that amount based on the eventual ruling
regarding the amounts owed on the petition date.  Davenport's
expert witness, Andrew J. Runge, assumed that the parties had
reached such a stipulation, but there was no such stipulation.[14]
First, the parties did not agree that Djourabchi and Welt would
eventually be entitled, as part of their allowed secured claim,
to interest in the pendency period based on the amounts shown on
the proof of claim (instead of based on the amount of principal
that the court eventually was to determine was owed on the
petition date).  Second, there was no stipulation for 6% interest
in the pendency period even though the trustee had requested that
change to make setting up her computer calculations of interest
easier (by making pendency interest and postconfirmation interest

---

[14]   Runge appears to have misinterpreted the court's
indication in confirming the debtor's plan that:

> Until the objection to claim is decided, the trustee
> shall make monthly distributions to Babak Djourabchi and
> Monica Welt equal in amount to (or exceeding) the minimum
> monthly payment due them under the plan based on the
> amount owed them as of the date of entry of this order
> pursuant to their proof of claim (as though no objection
> to claim had been filed) but such payments in the
> aggregate shall not exceed the $52,000 amount the debtor
> concedes is owed on that claim.

As noted previously, the amount the court ultimately was to decide
was owed as of the petition date would control how much interest
accrued during the pendency period after the petition date and the
date of confirmation of the plan.

accrue at the same rate).[15]   Accordingly, the court told the
trustee "you're stuck by what the Bankruptcy Code provides,"  Tr.
(Dkt. No. 162) at 11, meaning that the *Note* interest rate of
10.5% would apply to the accrual of interest until the
confirmation date.

At the pretrial, the parties attempted to enter into a
stipulation whereby Davenport would not challenge the
reasonableness of the attorney's fees as to the time spent and
the hourly rates paid, and there would be no need to put on
experts on that point.  The parties disagreed as to whether the
court should be able to consider the reasonableness of the fees
on its own without hearing expert testimony.  Djourabchi and Welt
accordingly brought forward an expert witness to testify as to
the reasonableness of the attorney's fees.  Djourabchi and Welt's
expert, Lawrence A. Katz, testified that based on the lodestar
analysis, the fees were reasonable.  However, Katz agreed that
fees incurred in pursuing foreclosure would be unreasonable if

---

[15]   Davenport's attorney, Orenstein, indicated "I certainly
have no objection" to using 6% interest per annum for the
pendency period, as that would benefit Davenport.  Tr. (Dkt. No.
162) at 11.  The response of Aronson, Djourabchi and Welt's
attorney, to Orenstein's statement was "My -- It does."  *Id.*
That was too vague a statement to reflect an agreement to the
trustee's using 6% interest for the pendency period.  Moreover,
the transcript does not entirely comport with the audio recording
of the hearing and my recollection: what Aronson actually said
was "My client certainly does," meaning his client certainly did
have an objection to using 6% per annum interest for the pendency
period.

Djourabchi and Welt did not reasonably believe that Davenport had been in monetary default.

Davenport challenged at the trial whether the rate charged by Djourabchi and Welt's attorneys was the rate agreed upon in their retainer agreements. Monica Welt testified that the rates Djourabchi and Welt's attorneys charged were the rates they agreed upon in the retainer agreements.

After the two-day trial, the court took the matter under advisement.

III

THE REQUESTED MODIFICATION OF THE CONFIRMED CHAPTER 13 PLAN

A confirmed chapter 13 plan may be modified upon request of the debtor, trustee, or a creditor holding an allowed secured claim. 11 U.S.C. § 1329(a). A plan modification may be used to reduce payments under the plan. § 1329(a)(1). A modified plan must comply with §§ 1322(a), 1322(b), 1323(c), and 1325(a). § 1329(b). Under § 1322(a)(1), the plan must "provide for the submission of all or such portion of future earnings or other future income of the debtor to the supervision and control of the trustee as is necessary for the execution of the plan." Additionally, a plan modification may not extend the plan beyond five years after the first payment under the original plan was due. § 1329(c). The party seeking the modification has the burden to show that the modification is permitted under § 1329.

35

*In re Anderson*, 545 B.R. 174, 176 (Bankr. N.D. Miss. 2015).

Davenport is seeking to reduce payments under the plan because, he contends, the claim held by Djourabchi and Welt has been fully paid.  Djourabchi and Welt contend that the claim has not been fully paid because interest has not been paid in full and because they are entitled to attorney's fees and expenses. For reasons explored below, Davenport is entitled to the requested modification of his plan.

A

11 U.S.C. §§ 506(b) AND 1325(a)(5)(B)

Under 11 U.S.C. § 506(b), as relevant here, Djourabchi and Welt, as the holders of an oversecured allowed secured claim, were entitled with respect to the determination of the amount of their allowed secured claim, to "interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement . . . under which such claim arose."  Section 506(b) plainly applies to any fees for which Davenport incurred a reimbursement liability before confirmation of the plan on January 15, 2016 (which was the plan's effective date).  However, § 506(b) governs only interest and fees owed as a debt of

36

Davenport **prior to confirmation**.[16]  *See  Countrywide Home Loans,
Inc. v. Hoopai (In re Hoopai)*, 581 F.3d 1090, 1099-1100 (9th Cir.
2009).  *See also First United Sec. Bank v. Garner (In re Garner)*,
663 F.3d 1218, 122-21 (11th Cir. 2011); *Telfair v. First Union
Mortg. Corp.*, 216 F.3d 1333, 1339 (11th Cir. 2000) (fees incurred
postconfirmation are not governed by § 506(b)); *Milham v. Key
Bank N.A. (In re Milham)*, 141 F.3d 420, 423 (2d Cir. 1998)
("Section 506(b) . . . defines the allowed claim of an
oversecured creditor; treatment of that claim after confirmation
is governed by Section 1325 . . ."").  Under § 506(b), an
oversecured creditor is entitled to reasonable attorney's fees
provided for under the parties' contract.  *Welzel v. Advocate
Realty Investments, LLC (In re Welzel)*, 275 F.3d 1308, 1315 (11th
Cir. 2001).  This question under § 506(b) of whether fees
provided for under the parties' contract are reasonable is

---

[16] Nonbankruptcy law, not § 506(b), would govern the issue
of reasonableness of attorney's fees for which Davenport became
liable prepetition.  *See  In re McLemore*, 426 B.R. 728, 747
(Bankr. S.D. Ohio 2010); *In re McKenna*, 362 B.R. 852, 855 (Bankr.
N.D. Ohio 2006).  However, that is an academic question here
because the court has already disallowed prepetition attorney's
fees and in opposing the *Motion to Modify*, Djourabchi and Welt
have expressly stated that they are not seeking prepetition fees
pursuant to the *Application for Fees and Expenses*.

governed by Federal law.  *Hoopai*, 581 F.3d at 1101.[17]

Once the allowed secured claim is fixed under § 506(b) as of the date of confirmation, § 1325(a)(5) requires in relevant part the plan must provide that:

> (ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim; and
> (iii) if—
> > (I) property to be distributed pursuant to this subsection is in the form of periodic payments, such payments shall be in equal monthly amounts[.]

This necessarily means that the allowed secured claim being paid under a confirmed plan based on § 1325(a)(5)(B) is the allowed secured claim determined as of the effective date of the plan (here, the date of confirmation of the plan), together with postconfirmation interest assuring that the creditor receives the present value of its allowed claim.

---

[17]  However, when a debtor's confirmed plan calls for a cure of a default, 11 U.S.C. § 1322(e) provides that the amount necessary to cure the default "shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law" notwithstanding 11 U.S.C. §§ 506(b), 1322(b)(2), and 1325(a)(5). Section 1322(e) does not apply here because "cure under § 1322(e) is conceptually distinct from cramdown."  *In re Harko*, 211 B.R. 116, 122 (B.A.P. 2d Cir. 1997), *aff'd sub nom. In re Milham*, 141 F.3d 420 (2d Cir. 1998); *In re Sanders*, 521 B.R. 739, 743 (Bankr. D.S.C. 2014) ("Section 1322(e) applies to situations where a debtor's plan intended to cure a default and reinstate the pre-bankruptcy agreement as if the default had never occurred.") (citation omitted)).

B

DAVENPORT'S LIABILITY FOR ATTORNEY'S FEES

Although § 506(b) provides that an allowed secured claim

that is oversecured includes reasonable attorney fees under the

agreement under which the claim arose, Davenport had no liability

in the preconfirmation period for attorney's fees.  As to the

period between the petition date and the confirmation date, the

period to which § 506(b) applies, Davenport incurred no

reimbursement liability for attorney's fees paid by Djourabchi

and Welt.  This follows from section 9 of the *Deed of Trust*,

which provides:

> Any amounts disbursed by Lender under this Section 9
> shall become additional debt of Borrower secured by this
> Security Instrument.  These amounts shall bear interest
> at the Note rate from the date of disbursement and shall
> be payable, with such interest, upon notice from Lender
> to Borrower requesting payment.

No fees became a liability of Davenport in the postpetition

period preceding the date of confirmation because Djourabchi and

Welt had not given Davenport notice of any fees they had paid in

the postpetition period.

The court's *In Limine Decision* entered on September 11,

2017, noted at page 26 that "[a]s of the confirmation date, no

postpetition attorneys' fees had yet been invoiced to the

creditors.  (See Dkt. No. 137.)"  That statement was incorrect,

but the outcome the court arrived at was correct.  Ridberg

Aronson LLC had issued invoices to Djourabchi and Welt on

39

November 1, 2015; December 1, 2015; and January 4, 2015.
Djourabchi and Welt made only one payment of such fees prior to
the confirmation date, a disbursement of $5,000 on January 4,
2016.  However, prior to confirmation of Davenport's plan on
January 15, 2016, Djourabchi and Welt had failed to give
Davenport notice that this amount was owed.  Djourabchi and
Welt's proof of claim filed in November 2015 cannot be treated as
giving notice of Davenport's obligation to pay $5,000 to
Djourabchi and Welt because Djourabchi and Welt had not paid that
$5,000 until January 4, 2016.  Under paragraph 9 of the *Deed of
Trust*, such amounts were payable by Davenport only upon notice
that such a payment had been made with a request for
reimbursement.

Accordingly, the result remains the same as recited in the
*In Limine Decision*: as of confirmation of the plan on January 15,
2016, there was no amount of attorney's fees for which Davenport
had a reimbursement liability.  As of the confirmation date, the
obligation was treated by § 1325(a)(5)(B) as fully matured, and
the $26,422.90 credit was to be applied to the allowed secured
claim, which stood at $80,000.00 plus preconfirmation interest
that had accrued postpetition, with no attorney's fee component.

For purposes of Davenport's confirmed plan, providing for
payment of Djourabchi and Welt's allowed secured claim with
postconfirmation interest of 6% per annum thereon, the allowed

40

secured claim has to be fixed as of the confirmation date and the
plan cannot be treated as providing for attorney's fees for which
Davenport incurred a reimbursement liability postconfirmation.
*See In re Eickerman*, No. 02-17096-B-13, 2012 WL 8074211, at *15-
16 (Bankr. E.D. Cal. Mar. 22, 2012), *aff'd sub nom. Eickerman v.
La Jolla Grp.*, II, No. CV-F-12-618 LJO, 2012 WL 4747236 (E.D.
Cal. Oct. 4, 2012), *aff'd*, 592 F. App'x 614 (9th Cir. 2015).  As
will be seen, Davenport and the Property remain liable for
attorney's fees for which a reimbursement obligation arose
postconfirmation, but that has no impact on the *Motion to Modify*,
which concerns whether the allowed secured claim (which does not
include postconfirmation fee reimbursement obligations) has been
paid.

C

THE PENDENCY INTEREST COMPONENT OF THE ALLOWED SECURED CLAIM

As holders of an oversecured claim, Djourabchi and Welt were
entitled under § 506(b) to interest in the pendency period (the
period between the petition date and the date of confirmation of
the plan) as part of their allowed secured claim.  The *In Limine
Decision* calculated pendency interest totaling $2,139.93 using a
per diem rate of $23.01 per day based on interest of 10.5% per

41

annum, the interest rate under the parties' contract.[18]
Accordingly, the amount owed as of the confirmation date was
$80,000.00 in principal, plus pendency interest of $2,139.93, but
after the credit of $26,422.90 was applied, the resulting allowed
secured claim was $55,717.03.

D

POSTCONFIRMATION INTEREST ON THE ALLOWED SECURED CLAIM

The court held in the *In Limine Decision* that the plan
provides that the debt will be amortized, thereby negating the
provisions under the *Note* barring partial prepayment of
principal, and requiring that payments be interest only payments.
As provided by the confirmed plan, after confirmation of the plan
interest ran at 6% interest per annum on the allowed secured

_____

[18]   As to the rate of interest in the pendency period
between the petition date and the confirmation date, § 506(b)
does not mandate the use of contract interest, *Milham*, 141 F.3d
at 423, but "[t]here is a rebuttable presumption in favor of
granting an oversecured creditor interest at the rate specified
in the contract, subject to equitable considerations." *In re
Gen. Growth Properties, Inc.*, 451 B.R. 323, 326 (Bankr. S.D.N.Y.
2011).  The debtor bears the burden of rebutting that
presumption.  *See In re Southland Corp.*, 160 F.3d 1054, 1059-60
(5th Cir. 1998).  Davenport's *Motion In Limine Regarding
Interpretation of Court's Orders and Application of Payments Made
on Account of Creditors' Claim* filed on June 30, 2017, requested,
among other things, a ruling that postconfirmation interest would
be at 6% per annum (which at least one of the experts had
erroneously assumed was the rate of pendency interest agreed to
at the confirmation hearing).  However, that *Motion in Limine* did
not attempt to justify pendency interest being at 6% per annum
instead of 10.5% per annum.  Davenport has not argued that the
court should revisit the issue of the appropriate rate of
pendency interest.  Accordingly, I will use the presumptively
correct rate of 10.5% specified by the parties' contract.

42

claim (fixed as of the confirmation date) except that the parties
stipulated during the trial of the objection to the proof of
claim that interest would not accrue from April 27, 2016, through
July 7, 2017, the recess period between the first day and the
second day of the objection to claim trial.

I calculate interest on the allowed secured claim of
$55,717.03 owed on the petition date based on interest of 6% per
annum after the confirmation date, taking in to account that 2016
was a leap year with 366 days.  The amount owed at the end of
January 31, 2017, was $97.70, calculated as  follows:

| | | |
|---|---:|---|
| 1/15/2016 | **$55,717.03** | Starting balance |
| 1/29/2016 | $127.87 | Interest at 6% for 14 days (taking into account that 2016 was a leap year with 366 days) |
| 1/29/2016 | -$609.07 | Payment |
| 1/29/2016 | -$2,125.11 | Payment |
| 1/29/2016 | -$1,391.18 | Payment |
| 1/29/2016 | **$51,719.54** | Ending balance |
| 2/29/2016 | $262.84 | Interest for 31 days |
| 2/29/2016 | -$598.44 | Payment |
| 2/29/2016 | -$2,061.56 | Payment |
| 2/29/2016 | **$49,322.38** | Ending balance |
| 3/31/2016 | $250.65 | Interest for 31 days |
| 3/31/2016 | -$588.14 | Payment |
| 3/31/2016 | -$2,071.86 | Payment |
| 3/31/2016 | **$46,913.03** | Ending balance |
| 4/27/2016 | $207.65 | Interest for 27 days |
| 4/27/2016 | **$47,120.68** | Ending balance |
| 4/29/2016 | $0.00 | No interest for 2 days |
| 4/29/2016 | -$577.78 | Payment |
| 4/29/2016 | -$2,049.98 | Payment |
| 4/29/2016 | **$44,492.92** | Ending balance |
| 5/31/2016 | $0.00 | No interest for 32 days |
| 5/31/2016 | -$567.53 | Payment |
| 5/31/2016 | -$2,192.47 | Payment |

43

| | | |
|---|---:|---|
| 5/31/2016 | **$41,732.92** | Ending balance |
| 6/30/2016 | $0.00 | No interest for 30 days |
| 6/30/2016 | -$556.56 | Payment |
| 6/30/2016 | -$2,103.44 | Payment |
| 6/30/2016 | **$39,072.92** | Ending balance |
| 7/7/2016 | $0.00 | No interest for 7 days |
| 7/7/2016 | **$39,072.92** | Ending balance |
| 7/29/2016 | $140.92 | Interest for 22 days |
| 7/29/2016 | -$194.50 | Payment |
| 7/29/2016 | -$2,135.15 | Payment |
| 7/29/2016 | -$42.19 | Payment |
| 7/29/2016 | **$36,842.00** | Ending balance |
| 8/31/2016 | $199.31 | Interest for 33 days |
| 8/31/2016 | -$183.82 | Payment |
| 8/31/2016 | -$1,016.18 | Payment |
| 8/31/2016 | **$35,841.31** | Ending balance |
| 10/28/2016 | $340.79 | Interest for 58 days |
| 10/28/2016 | -$357.48 | Payment |
| 10/28/2016 | -$2,042.52 | Payment |
| 10/28/2016 | **$33,782.10** | Ending balance |
| 11/30/2016 | $182.76 | Interest for 33 days |
| 11/30/2016 | -$168.53 | Payment |
| 11/30/2016 | -$2,231.47 | Payment |
| 11/30/2016 | **$31,564.86** | Ending Balance |
| 12/31/2016 | $160.41 | Interest  to 12/31/2016 (end of leap year) |
| 12/31/2016 | **$31,725.27** | Ending balance |
| 1/31/2017 | $161.67 | Interest for 31 days |
| 1/31/2017 | -$314.74 | Payment |
| 1/31/2017 | -$31,474.50 | Payment |
| 1/31/2017 | **$97.70** | Ending balance |

Nothing in the testimony of Davenport's expert witness, Runge,[19]

---

[19]   Runge's approach was essentially sound except for his erroneous assumption that there was a stipulation that interest during the pendency period (between the petition date and the confirmation date) was to be calculated based on interest of 6% per annum on the proof of claim amount.

or Djourabchi and Welt's expert, Victor Lipnitsky,[20] negates the propriety of this conclusion.[21] Nor does the testimony of the Chapter 13 trustee negate the propriety of this conclusion.[22]

---

[20] Lipnitsky's initial approaches prepared on May 8, 2017 (Ex. K) were inconsistent with the court's later *In Limine Decision* concluding that under the plan the debt was to be paid on an amortization basis. A further approach (Ex. X) that Lipnitsky prepared after considering the *In Limine Decision* included the erroneous assumption that obligations Davenport incurred postconfirmation to reimburse Djourabchi and Welt for attorney's fees and expenses they had paid were to be added to the allowed secured claim to be paid under the plan. This disregarded the conclusion in the *In Limine Decision* that "it is clear that until the creditors paid attorneys' fees, the amounts that the debtor owed and to which payments could be applied did not include any such attorneys' fees," Dkt. No. 168 at 26 n.5, and disregarded the amount of the allowed secured claim had to be fixed as of the confirmation date.

[21] Lipnitsky did not re-do his calculations until late the night before the start of the trial on February 27, 2018. Lipnitsky did a final calculation (Exhibit Z), attempting to use Runge's calculation method, starting with the court's figure of $55,717.03 and excluding the attorney's fees and expenses. He arrived at a remaining amount of $142.00 as of January 31, 2017. However, he used rounded numbers, and his interest calculations appear to be mathematically erroneous. For example, for the 14-day period ending 01/29/2016, he calculated that interest of $139 accumulated on the staring balance of $55,717.03. That equates to interest of 6.5% per annum ($55,717.03 times 6.5% interest is $3,621.61 per annum, and divided by 366 days that results in $9.90 interest per day, which multiplied by 14 days yields $138.60 or $139 as a rounded figure). Finally, he did not include the payment of $42.19 (made, according to the trustee's *Payment History*, on July 29, 2016) as being made in July 2016, appearing to treat it as being made instead on July 30, 2017.

[22] The trustee's claim payment history does not show how interest was calculated or how payments were applied. Without this, I cannot determine whether interest was properly calculated and applied in accordance with the court's ruling in the *In Limine Decision*, nor can I determine whether the trustee took account of the stipulation between the parties that interest would not accrue from April 27, 2016, through July 7, 2016.

Interest accruing after January 31, 2017, and until November 30, 2020 (when the trustee may make her next disbursements under confirmed plans) will total $22.45, thus requiring that any payment by the trustee to Djourabchi and Welt on November 30, 2020, would have to equal $120.15 (the sum of $97.70 and $22.45) in order to fully pay Djourabchi and Welt's claim.

On March 21, 2017, the Chapter 13 trustee filed a response to the *Motion to Modify* and took the position that the *Motion to Modify* could be granted "provided that there are no additional administrative fees and costs approved," and noted that there are insufficient funds to pay any allowed administrative claim or any attorney's fees owed to Djourabchi and Welt as part of their allowed secured claim.  The IRS amended its proof of claim on October 5, 2017, prior to the trial of the *Motion to Modify*, reducing that claim by $677.48.  There are no pending applications for payment of administrative claims.  Accordingly, under the proposed modified plan, an additional $677.48 should be available from which the trustee can pay the $120.15 owed to Djourabchi and Welt as of November 30, 2020.  Davenport is entitled to the requested modification of his confirmed plan.

IV

POSTCONFIRMATION LIABILITIES
REGARDING ATTORNEYS' FEES AND EXPENSES

This decision will only consider the attorney's fees

associated with the bankruptcy case.[23]  Djourabchi and Welt are
seeking a determination that they are entitled to attorney's fees
for attorney work performed postpetition both preconfirmation and
postconfirmation.  However, as noted previously, Davenport had no
liability for any of the fees until after confirmation of his
plan because Djourabchi and Welt had not given him notice of
their payment of any such fees.  Accordingly, Davenport's
obligation to reimburse Djourabchi and Welt for any payment of
the fees at issue arose postconfirmation.

The confirmed plan provided for payment of the allowed
secured claim, which was the amount owed as of the date of
confirmation of Davenport's plan, with postconfirmation interest
of 6% per annum.  That did not erase Davenport's obligation
incurred postconfirmation under nonbankruptcy law to reimburse
Djourabchi and Welt for payments of postconfirmation fees.
First, that the postconfirmation attorney's fees were incurred in
the bankruptcy case, and in litigating issues under the
Bankruptcy Code, does not bar recovery.  *See Travelers Cas. &
Sur. Co. of Am. v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 449
(2007).  Second, Davenport's postconfirmation obligation to
reimburse Djourabchi and Welt for payments of fees incurred will

---

[23] As the court has already held in the *In Limine Decision*,
the right to reimbursement of payments of attorney's fees
incurred in the District Court case are dependent upon whether
Djourabchi and Welt are successful in showing that they had a
right to foreclose.

remain intact unless the obligation was to be discharged upon
Davenport's receipt of a discharge.  That turns on whether the
confirmed plan provided for the obligation.  The confirmed plan
cannot be construed as providing for that postconfirmation
obligation.  *See In re Eickerman*, 2012 WL 8074211, at *11.  It
follows that Davenport's receipt of a discharge under 11 U.S.C.
§ 1328(a) of debts "provided for" by the confirmed plan will not
discharge the reimbursement obligation regarding postconfirmation
fees.  *See In re Bryant*, 323 B.R. 635, 645 (Bankr. E.D. Pa. 2005)
("The discharge of the claim and satisfaction of the lien
securing the discharged debt only pertain to the obligation as of
the confirmation date."  Accordingly, the debtor in
*Bryant* remained liable for postpetition tax and insurance charges
owed the mortgagee.).

In addition, the postconfirmation fees remain subject to the
*Deed of Trust* lien.  The confirmed plan provided that Djourabchi
and Welt were to retain the *Deed of Trust* lien securing their
claim.  In turn, the *Deed of Trust* provided in paragraph 9 for
Djourabchi and Welt to be reimbursed for payments of reasonable
attorney's fees incurred in the bankruptcy case.  Any obligation
of Davenport to reimburse Djourabchi and Welt for their
postconfirmation payment of reasonable fees remains secured by

48

the *Deed of Trust* lien on the Property.[24]

Nothing in the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure requires a creditor to pursue allowance of a debtor's nondischargeable postconfirmation obligations that were not provided for by the plan.  Any postconfirmation obligation of Davenport to reimburse Djourabchi and Welt for payments they made of postpetition fees are not part of the allowed secured claim the trustee was to pay under the terms of the confirmed plan.  Nevertheless, when Djourabchi and Welt applied for allowance of postpetition fees, there was subject matter jurisdiction to decide the extent of Davenport's obligation to reimburse for payments of such fees, which could have an impact on the

---

[24]  Some courts suggest that after confirmation, a secured creditor's right to costs and fees are solely through the plan, and if the plan does not provide for fees or costs, then such creditor has no right to further fees.  *See In re Gluth Bros. Const., Inc.*, 426 B.R. 771, 778 (Bankr. N.D. Ill. 2010);  *In re 900 Corp.*, 327 B.R. 585, 603 (Bankr. N.D. Tex. 2005).  However, in both cases the confirmed plan expressly barred enforcement of the postconfirmation fees other than as provided in the plan.

administration of the case.[25]  The parties have spent

considerable effort addressing the attorney's fees incurred

postpetition, and the court retains subject matter jurisdiction

to determine the amount of Davenport's postconfirmation

obligation to reimburse for payments of fees.  I will thus

address the question of whether Davenport has any

postconfirmation obligation to reimburse Djourabchi and Welt for

payments of attorney's fees and expenses.[26]

---

[25]  For example, if the court had held that Davenport's
modified plan would not suffice to pay the allowed secured claim,
Davenport might have pursued a postconfirmation sale of the
Property (as occurred in *Hoopai*) or refinancing as a way to
complete payment of the allowed secured claim.  In that event,
the amount of the fees would be pertinent.  It could also be
pertinent to any motion Djourabchi and Welt might pursue for
relief from the automatic stay to permit them to collect the
fees.  Finally, it could provide information to Davenport
regarding how much he would need to pay in order to preserve his
fresh start.  (By way of analogy, consider Fed. R. Bankr. P.
3002.1(e), providing for the bankruptcy court, after a plan is
completed, to determine, in some circumstances, the amount of
postconfirmation charges that were not being paid under the
plan.)  There is also the possibility that Davenport could have
sought approval of a modified plan calling for paying both
amounts owed when the case was filed *and* postconfirmation fees.
I express no view on whether such a modified plan would be
appropriate, an issue which does not appear to have a clear-cut
answer.

[26]  Now that I have granted the *Motion to Modify*, the
*Application for Fees and Expenses* may not have much impact on the
completion of the Chapter 13 case.  However, jurisdiction must be
determined as of the date of the filing of the *Application*, not
based on where matters stand now.  *See Chapman v. Currie Motors,
Inc.*, 65 F.3d 78, 81 (7th Cir. 1995) ("Ordinarily, when a case is
within federal jurisdiction when filed, it remains there even if
subsequent events eliminate the original basis for federal
jurisdiction." (Citations omitted)).

The reasonableness of such fees is governed by State law,
and evaluation of reasonableness under § 506(b), which applies to
only preconfirmation fees, does not come into play.  *See Hoopai*,
581 F.3d at 1101.  Davenport stipulated that he would not
challenge the reasonableness of the attorney time it took to
perform any task and would not challenge the reasonableness of
the rates charged, but reserved the right to challenge the
reasonableness of the fees on other grounds.

Davenport contends that Djourabchi and Welt are not entitled
to attorney's fees for several reasons.[27]  As will be further
explained below, I find that Djourabchi and Welt have a right to
reimbursement of some of their attorney's fees associated with
the bankruptcy case.

A

RES JUDICATA

Davenport contends that Djourabchi and Welt are barred from
asserting attorney's fees accrued prior to the conclusion of the
trial on Davenport's objection to claim under the doctrine of res
judicata.  First, the pertinent question for purposes of fixing

---

[27]  One of those arguments deserves little discussion.
Davenport argued that Djourabchi and Welt had not provided their
retainer agreements to ensure that Djourabchi and Welt were being
charged what they agreed to under such agreements.  However, Welt
testified at trial that Djourabchi and Welt's attorneys charged
them according to the rate in their retainer agreements, and the
record reveals that Sam Russell's fees were to be capped at
$15,000.  I find this satisfactory to establish the fee
arrangements.

51

the allowed secured claim under the confirmed plan was what was
owed on the confirmation date.  As noted previously, as of the
confirmation date, Davenport had no obligation to reimburse
Djourabchi and Welt for fee payments, thus making the res
judicata argument a moot point.

Second, even if an obligation to reimburse for fee payments
had arisen before confirmation, the res judicata argument would
fail.  Davenport contends that Djourabchi and Welt could have
sought to include such an obligation as part of their allowed
secured claim.  However, there was no deadline for their seeking
a determination of the amount of any such obligation.  Davenport
contends that nevertheless the claims are still barred by res
judicata because such claims could have been raised during the
litigation of the objection to the proof of claim and were not.[28]

---

[28]   Davenport pointed to the District Court's initial
decision, *Davenport v. Djourabchi*, 316 F. Supp. 3d 58 (D.D.C.
2018), ruling that Davenport's damage claims for wrongful
foreclosure could have been raised as part of his objection to
Djourabchi and Welt's claim and were thus barred by res judicata.
That decision was vacated by *Davenport v. Djourabchi*, 316 F.
Supp.3d 58 (D.D.C. 2018), on the basis that res judicata did not
bar Davenport's wrongful foreclosure action because Davenport
could only bring damage claims via an adversary proceeding and
was prohibited from bringing his state and common law claims for
damages as part of the objection to claim.  Here, there was no
procedural bar to Djourabchi and Welt requesting that their
postpetition attorney's fees be adjudicated as part of the
adjudication of the objection to their proof of claim.  However,
the proof of claim only set forth the amounts claimed to be owed
as of the petition date, and the court treated the objection to
claim as limited to a request to fix the amount owed as of the
petition date.

However, the proof of claim asserted the amount owed as of the
petition date, and the objection to claim was viewed as limited
to objecting to the amount the proof of claim asserted was owed
on the petition date: the objection to claim included no express
request for a determination of postpetition obligations.  The
*Proof of Claim Order* fixed the amounts owed as of the petition
date and directed that "the claim of Djourabchi and Welt is
otherwise disallowed, except with respect to amounts allowable
under 11 U.S.C. § 506(b) incurred after the commencement of the
case," thereby treating any claim for reimbursement of
postpetition attorney's fees as not having been at issue and
leaving the assertion of such a claim for a later time.
Davenport did not seek to have the court revise that ruling, and
it is the law of the case.  Accordingly, the claim for
postpetition attorney's fees is not barred by res judicata.

B

RULE 3002.1 NOTICE

Davenport contends that Djourabchi and Welt may not claim
attorney's fees because they failed to provide timely notice as

53

required by Fed. R. Bankr. P. 3002.1.[29]   I reject this argument because whichever version of Rule 3002.1 is treated as the rule in effect in this bankruptcy case, Rule 3002.1 does not apply to the postpetition attorney's fees incurred.

Rule 3002.1 as originally adopted in 2011, and as in effect when the debtor's plan was confirmed, applied under Rule 3002.1(a) to creditors in a chapter 13 case "(1) that are secured by a security interest in the debtor's principal residence, and (2) provided for under § 1322(b)(5) of the Code in the debtor's plan."[30]   Here, the debtor's confirmed plan did not provide for the secured claim under § 1322(b)(5), but instead treated the secured claim under 11 U.S.C. § 1325(a)(5) as allowed by 11 U.S.C. § 1322(c)(2).   As the court noted in its oral decision

---

[29]   Rule 3002.1 was added to the Federal Rules of Bankruptcy Procedure in 2011 "to aid in implementation of § 1322(b)(5), which permits a chapter 13 debtor to cure a default and maintain payments on a home mortgage over the course of the debtor's plan."   Advisory Committee Note (2011).   The rule required such creditors to provide the debtor notice of payment changes, fees, expenses, and charges so that the debtor had an opportunity to contest them during the chapter 13 bankruptcy.   *Id.*   The rule addressed the significant problem where mortgage creditors applied fees and costs from postpetition defaults without providing the debtor notice and would initiate foreclosure, based on those postpetition defaults, upon the debtor's completion of the chapter 13 plan.   *See In re Tollios*, 491 B.R. 886, 888 (Bankr. N.D. Ill. 2013).

[30]   The rule required such creditors "to serve on the debtor, debtor's counsel, and the trustee a notice itemizing all fees, expenses, or charges (1) that were incurred in connection with the claim after the bankruptcy case was filed, and (2) that the holder asserts are recoverable against the debtor or the debtor's principal residence."   Rule 3002.1(c).

granting confirmation, the confirmed plan provides that the
allowed secured claim, in the amount owed as of the date of
confirmation, will be paid in full with postconfirmation interest
at 6% per annum.

Rule 3002.1(a) was amended effective December 1, 2016 (after
the plan had been confirmed) to read:

> This rule applies in a chapter 13 case to claims (1) that
> are secured by a security interest in the debtor's
> principal residence, and (2) for which the plan provides
> that either the trustee or the debtor will make
> contractual installment payments.

As amended, Rule 3002.1[31] does not apply here because the
confirmed plan does not provide "that either the trustee or the

---

[31]   The significant changes in Rule 3002.1 were the removal
of the reference to § 1322(b)(5) and to cover all instances of a
plan providing for payment of "contractual installment payments"
(whether by the trustee or by the debtor).   The Advisory
Committee explained the purpose of the change:

> Subdivision (a) is amended to clarify the applicability
> of the rule.  Its provisions apply whenever a chapter 13
> plan provides that contractual payments on the debtor's
> home mortgage will be maintained, whether they will be
> paid by the trustee or directly by the debtor.   The
> reference to § 1322(b)(5) of the Code is deleted to make
> clear that the rule applied even if there is no
> prepetition arrearage to be cured. So long as a creditor
> has a claim that is secured by a security interest in the
> debtor's principal residence and the plan provides that
> contractual payments on the claim will be maintained, the
> rule applies.

The rule change overruled the line of cases holding that Rule
3002.1 did not apply to mortgage lenders with no prepetition
arrears and followed the line of cases, such as *In re Tollios*,
holding the rule applied to plans providing for maintenance of
payments under § 1322(b)(5) regardless of whether the plan also
addressed prepetition mortgage arrears.

debtor will make contractual installment payments." Instead, the confirmed plan provides that the allowed secured claim, fixed as of the date of confirmation, will be paid in full with postconfirmation interest at 6% per annum. This eliminated Djourabchi and Welt's entitlement to contractual installment payments.[32]

In short, whether the 2011 version of Rule 3002.1 or the current version of Rule 3002.1 is treated as the rule in effect in this bankruptcy case, Rule 3002.1 does not apply to the postpetition attorney's fees incurred.

C

EQUITABLE ESTOPPEL OR WAIVER

Davenport contends that Djourabchi and Welt should be estopped from asserting or be deemed to have waived attorney's fees incurred postpetition because, by not filing a § 506(b) motion, or filing an amended proof of claim, Djourabchi and Welt

---

[32]  The *Note* required Davenport to make interest payments of 10.5% per annum, but Davenport's confirmed plan, as authorized by § 1325(a)(5), modified the *Note* to provide that the allowed secured claim would be paid in full with 6% interest per annum postconfirmation (which was the effective date of the plan), and it was upon confirmation that the trustee was obligated to start making such payments to Djourabchi and Welt. By reason of 11 U.S.C. § 506(b), the allowed secured claim would include interest accruals provided for by the *Note* at 10.5% per annum until the date of confirmation, plus attorney's fees allowed under § 506(b) that were incurred before the confirmation date. Also, as noted in the *In Limine Decision*, the court recognized that the plan amortized the payments on the allowed secured claim, and that change eliminated ¶ 2 of the *Note*, which provides that "monthly payments shall remain interest-only for life."

represented that they did not have any attorney's fees to claim. I reject this argument.

First, the argument is inapposite. For reasons already explained, there were no amounts that are recoverable under § 506(b) other than postpetition interest incurred preconfirmation. The fees at issue, for which Davenport became liable postconfirmation, were not part of the allowed secured claim being paid under the plan, and there was thus no need to seek allowance of those fees in order to enjoy any right to payment under the confirmed plan. In addition, there was no obligation to disclose such fees not provided for by the confirmed plan because Rule 3002.1 did not apply.

Second, even if there were any fee reimbursement obligation amounts recoverable under § 506(b), equitable estoppel would not apply because Davenport has been aware that Djourabchi and Welt were asserting a right to postpetition fees. Equitable estoppel does not apply unless there is (1) a definite representation by word or deed; (2) that the party claiming estoppel reasonably relied upon; (3) to his detriment by the change of his position. *See Carroll v. Fremont Inv. & Loan*, 636 F. Supp. 2d 41, 55 (D.D.C. 2009). Davenport was on notice that Djourabchi and Welt maintained they had a right to postpetition fees incurred in the bankruptcy case. The response to the objection to the claim filed on February 2, 2016, less than a month after confirmation

57

of Davenport's plan, indicated that Djourabchi and Welt were
entitled to postpetition fees, citing 11 U.S.C. § 506(b).  Dkt.
No. 51 at 3.  And the *Proof of Claim Order* of July 21, 2016,
carved out "amounts allowable under 11 U.S.C. § 506(b) incurred
after the commencement of the case" as not being adjudicated by
that *Order*, clearly leaving the issue of § 506(b) claims in play.
Seven months later, Djourabchi and Welt sought their postpetition
fees in their February 22, 2017 *Supplemental Opposition* to the
*Motion to Modify*.[33]  Here, Djourabchi and Welt's failure to file
a § 506(b) motion for attorney's fees was not a definite
representation that they would not seek the attorney's fees to
which they were entitled under the *Deed of Trust*.  Furthermore,
Davenport could not reasonably have relied upon the failure to
file a § 506(b) motion, even if it was a "representation" that
Djourabchi and Welt would not claim attorney's fees.  Djourabchi

---

[33]  This case is thus distinguishable from cases in which a
creditor fails, prior to completion of a debtor's plan, to assert
a claim for postpetition fees (which, if they had been sought and
allowed, would have been part of the creditor's allowed secured
claim to be paid under the plan).  Such a failure can bar the
fees by reason of the debtor's discharge under 11 U.S.C.
§ 1328(a) and 11 U.S.C. § 1327(c) (providing that except as
otherwise provided in the plan, the property vesting in the
debtor is free and clear of any claim provided for by the plan).
*See In re Eickerman*, 2012 WL 8074211, at *14 ("By failing to
amend its proof of claim to include pre-confirmation Fees and
Expenses, [the mortgagee] waived any right to recover these sums
after Eickerman completed his obligations under the Plan and the
discharge was entered.  By failing to provide Eickerman with an
updated statement of the amount owed at confirmation, [the
mortgagee] effectively consented to accept less than the amount
then owed in full satisfaction of the claim.").

and Welt have sought, and told Davenport on multiple occasions,
that they would seek attorney's fees related to the *Note* and *Deed
of Trust*.  Accordingly, Djourabchi and Welt would not be
equitably estopped from seeking any attorney's fees allowable
under § 506(b), if there had been any.

D

IMPACT OF ALLEGED WRONGFUL
FORECLOSURE ON REASONABLENESS OF FEES

Davenport asserts that the attempted foreclosure was
wrongful, that he filed this case in response to the wrongful
foreclosure, and that, accordingly, Djourabchi and Welt ought not
be entitled to reimbursement of fees and expenses in the
bankruptcy case.  Djourabchi and Welt argue that the bankruptcy
case was unnecessary because Davenport could have brought a
proceeding in the D.C. Superior Court or in the U.S. District
Court seeking an injunction or declaratory judgment against
them.[34]

Whether Djourabchi and Welt's foreclosure effort was
wrongful does not affect their right to recover reasonable
attorney's fees in the bankruptcy case, but it may affect the
measure of damages to which Davenport may be entitled in the

---

[34]  If Davenport had prevailed in such a proceeding it is
doubtful that Djourabchi and Welt would have been entitled to be
reimbursed for their fees and expenses.  Accordingly, Davenport
might argue that similarly he ought not be required to reimburse
Djourabchi and Welt for fees and expenses in this case.

pending District Court action.  Paragraph 9 of the *Deed of Trust* provided in relevant part:

> If . . . there is a legal proceeding that might significantly affect Lender's interest in the Property and/or Lender's rights under this Security Instrument (such as a proceeding in bankruptcy, . . .) . . . then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's Lender's interest in the Property and rights under this Security Instrument . . . .  Lender's actions can include, but are not limited to: . . . (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding.

Not only were Djourabchi and Welt's interests and rights at risk in this bankruptcy case, but those rights and interests have been affected.  For example, the court has decided in its *Proof of Claim Decision* that Djourabchi and Welt are no longer entitled to prepetition attorney's fees, and under the confirmed plan the debt owed as of the confirmation date will be amortized with interest of 6% per annum (not 10.5%) (with the requirement that monthly payments will be interest only payments eliminated, and with the requirement of full payment of the $80,000 of principal on September 22, 2016, eliminated).  Accordingly, this objection to any recovery of attorney's fees and expenses fails.  Once the bankruptcy case ensued, Djourabchi and Welt of necessity were entitled to defend their interests within the bankruptcy case.

I leave for resolution in the District Court civil action a determination whether, if the foreclosure notice was wrongful, Davenport was forced by the wrongful foreclosure notice to file

60

his bankruptcy case (or some other proceeding to address
Djourabchi and Welt's inflated claim), and, if so, whether any
award of fees to Djourabchi and Welt in the bankruptcy case is a
damage suffered by Davenport by reason of the wrongful
foreclosure notice that he arguably would not otherwise have
incurred.

E

DJOURABCHI AND WELT'S REJECTION OF DAVENPORT'S TENDER

Davenport contends that the attorney's fees are not owed
because he tendered more than sufficient funds to fully pay the
*Note* when he deposited a check for $60,980 into Djourabchi and
Welt's Citibank account on May 27, 2015, and that Djourabchi and
Welt wrongly rejected that payment. I reject this contention.

Davenport advances several theories for why Djourabchi and
Welt were obligated to accept his May 27, 2015, payment. First,
he argues that the requirement for prepayment under ¶ 4 of the
*Note* did not apply because there was a conflict between ¶ 4 and
¶ 2, regarding the making of payments under the *Note*, and ¶ 4 is
subordinate to ¶ 2 under a subordinate clause. Second, he argues
that the *Note* was accelerated in 2009, and accordingly, the whole
amount under the *Note* was due, removing the requirement of
prepayment notice under ¶ 4 of the *Note*. Third, even if ¶ 4
still required notice for prepayment, Davenport contends that he
had given notice in 2009 when he told Djourabchi and Welt that he

61

intended to pay off the *Note* at the end of his first bankruptcy.
Fourth, Davenport contends that Djourabchi and Welt were
obligated to accept Davenport's tender because the amount he
tendered exceeded the amount owed.  For the reasons stated below,
I reject each of these arguments and conclude that Djourabchi and
Welt were not required to accept Davenport's tender.[35]

> 1. *Alleged Conflict Between Paragraphs 2 and 4 of the Note*

Davenport contends that ¶ 4 of the *Note* does not apply,
because it conflicts with ¶ 2 of the *Note*.  Under ¶ 2, "Any and
all payments by Debtor, including but not limited to prepayments
of principal, interest, or any other amounts of any kind with
respect to this Promissory Note shall be made in immediately
available funds by debtor to Creditor . . . on or before the due
date and without prior demand."  Paragraph 4 of the *Note* permits
Davenport to prepay the *Note* if Davenport "deliver[s] to Creditor
notice of intent to prepay at least 20 (Twenty) days in advance

---

[35]   Davenport also made the argument that Djourabchi and
Welt did not cooperate with him when he tried to learn how much
was still owed on the debt, which, if true, may be a breach of
contract.  However, the record does not present a clear picture
regarding what efforts Davenport made to learn how much was owed
on the debt, and whether Djourabchi and Welt responded to those
requests, or the substance of any responses Djourabchi and Welt
may have provided.  Moreover, Davenport's testimony indicates
that what Davenport meant by "not cooperating" is that he did not
trust Djourabchi and Welt's calculations.  Accordingly, I cannot
find that Djourabchi and Welt breached the contract in that
regard, and it is unnecessary to decide whether such a breach
would require a denial of attorney's fees.

of [Davenport's] intended date of prepayment."  Paragraph 4 also
includes a clause stating that "[i]f there is a conflict between
the provisions of this Paragraph and any other terms and
conditions outlined in this instrument, this Paragraph shall be
subordinate to all others."  Davenport contends that there is a
conflict because ¶ 4 only permits prepayments after notice, but
¶ 2 permits any payment, including prepayments, to be paid on or
before the due date.  Davenport concludes that ¶ 2 would govern
Davenport's payment, which would permit Davenport to make a
prepayment without 20-day notice, because, in case of a conflict,
¶ 4 is made subordinate to ¶ 2.

However, there is no inconsistency between paragraph 2 and
paragraph 4.  Paragraph 4 conditions prepaying principal on
Davenport's giving 20 days advance notice of his "intended date
of prepayment."  If he failed to give such notice, he had no
right to prepay principal, and there would be no authorized

prepayment to which paragraph 2 could apply.[36]  If he gave notice

of an intended date of prepayment then a due date would be fixed,

and paragraph 2 would arguably permit prepayment to be made "on

or before the due date."  However, he failed to give notice of

his "intended date of prepayment."  Paragraph 2 also requires

that monthly payments will be "interest-only for life."  This

court held in the *Proof of Claim Decision* that the "*Note* made

clear that only payments of interest would be accepted before

full payment of the entire debt."  The due date for the principal

of $80,000, was September 22, 2016.  The *Note* provides for an

exception to interest-only payments, by allowing for prepayment,

but the due date of a prepayment can only be made by Davenport's

providing a 20-day notice, with a due date included in such

notice.  Davenport did not provide a 20-day notice, and hence the

---

[36]  Besides the fact that the *Note* prohibited prepayment
without proper notice, the District of Columbia adheres to the
"perfect tender in time" rule.  *Trilon Plaza, Inc. v. Comptroller
of State of New York*, 788 A.2d 146, 151 (D.C. 2001).  The perfect
tender in time rule "prohibits prepayment of a debt secured by a
mortgage unless there is an agreement between the parties (or a
statute) specifically permitting such prepayment."  *Id.*  "[A]
lender cannot be compelled to accept prepayment of a mortgage
note even when the full amount of interest for the full term of
the mortgage is tendered . . . ."  *Westminster Investing Corp. v.
Equitable Assur. Soc. of U.S.*, 443 F.2d 653, 657 (D.C. Cir.
1970).  The maturity date of the note was September 22, 2016,
more than a year after Davenport deposited his check, but
paragraph 4 of the *Note* provided an exception to the "perfect
tender in time rule" by allowing Davenport to give notice of at
least 20 days of his "intended date of prepayment."  Paragraph 2
cannot be read as permitting prepayment in violation of the
"perfect tender in time" rule.

prepayment did not have a due date.  Without a due date,
Davenport could not make a prepayment under ¶ 2.  Therefore,
there is no conflict between ¶¶ 2 and 4, and the subordinate
clause is of no effect, or help to Davenport.

    2.  *Issue of Whether the Note Had Been Accelerated*

Davenport contends that there was no need to provide notice
because Djourabchi and Welt had accelerated the *Note*.  As
explained below, acceleration had not occurred.

Acceleration is not a remedy provided for under the *Note*.
However, the *Deed of Trust* permits acceleration under § 18 if
Davenport transferred the Property or a beneficial interest or
under § 22 "following [Davenport's] breach of any covenant or
agreement in this Security Instrument."  Under § 11, Davenport
"shall be in default if any action or proceeding, whether civil
or criminal, is begun that, in Lender's judgment, could result in
forfeiture of the Property or other material impairment of
Lender's interest in the Property or rights under this Security
Instrument."  Section 22 requires that:

> Lender  shall  give  notice  to  Borrower  prior  to
> acceleration following Borrower's default or breach of
> any covenant or agreement in this Security Instrument
> . . . The notice shall specify (a) the default; (b) the
> action required to cure the default (c) a date, not less
> than 30 days from the date the notice is given to
> Borrower, by which the default must be cured; and (d)
> that failure to cure the default on or before the date
> specified in the notice may result in acceleration of
> sums secured by  this Security Instrument and sale of the
> Property.  The notice shall further inform Borrower of
> the right to reinstate after acceleration and the right

to bring a court action to assert the non-existence of a default or any other defense of borrower to acceleration and sale.

Failure to provide proper notice will result in a failure to accelerate. *Ex Parte Turner*, No. 1160212, 2017 WL 3821270, at *5 (Ala. September 1, 2017) (the court held that the acceleration had failed because the notice of intent to accelerate failed to include notice of the right to reinstate and the right to bring suit); *Sweeny v. American Home Mortg. Servicing Inc.*, No. 4:10-cv-111, 2011 WL 710986, at *4 (S.D. Ga. February 22, 2011) (finding foreclosure failed because notice of intent to accelerate was improper by not giving 30 days notice); *In re Sharpe*, 425 B.R. 620, 642-43 (Bankr. N.D. Ala. 2010) (finding acceleration had failed because of improper notice of intent to accelerate).

Djourabchi had demanded that Davenport pay the whole debt by September 2008 after his first default to Bayview in 2007, however, there is no evidence of what that notice included, and it was resolved by Davenport's proceeding to pay an additional $300 a month.  There is no evidence in the record that Djourabchi or Welt provided the proper notice of acceleration under § 22 of the *Deed of Trust*.

A failure to provide notice of acceleration occurred as well in 2009.  On August 18, 2009, Djourabchi sent an email to Davenport stating:

66

> Please Coordinate a time to meet with me today before
> 3:30 PM, so that this loan could be paid in full. . . .
> Please remember, that as of today, you are in default on
> this loan.  By the terms and conditions of the secondary
> lien on your property, ANY act of default on ANY debt
> owed by you constitutes a breach and immediate
> acceleration of all debts owed.  Therefore, my next step
> is to engage my attorney (Russell Drazin) **for the service
> of executing an acceleration** and the possible subsequent
> foreclosure of the subject property.

[Emphasis added.]  The email did not meet the *Deed of Trust's*

explicit requirements regarding acceleration.  It told Davenport

that he was in default and that this constituted "a breach and

immediate acceleration of all debts owed," but it made clear that

Djourabchi and Welt were in the process of having Drazin

accelerate the debt.  Neither the *Note* nor the *Deed of Trust*

provided for acceleration to occur automatically upon a default

occurring.  The August 18, 2019 email did not effect an

acceleration in accordance with the *Deed of Trust*:[37] it failed to

inform Davenport of his right to cure the default, or of any

action he could take to cure the default, or of his right to

bring a suit to prove he was not in default, or of a date of at

least 30 days in which to cure the default.  There is no evidence

that prior to the initiation of Davenport's first bankruptcy case

---

[37] As noted above, the *Deed of Trust* permitted acceleration
only after notice of: (1) the default; (2) any action to cure the
default; (3) a date of at least 30 days to cure the default; (4)
that failure to cure would result in acceleration; (5)
Davenport's right to reinstate after the acceleration; and (6)
Davenport's right to bring suit in court to prove he was not in
default.

Drazin or anyone else ever issued a notice to Davenport complying with § 22 of the *Deed of Trust* regarding acceleration.

There may have been a proper acceleration at some point after the first bankruptcy was completed because Djourabchi and Welt caused notice to be issued regarding a foreclosure sale of the Property set for October 20, 2015, and foreclosure could occur only after acceleration of the debt.  The court has no evidence on this point.  However, any such acceleration likely occurred after the tender of $60,980 made on May 27, 2015, and there is no evidence that it occurred beforehand.

This is no evidence that prior to Davenport's tender of $60,980 on May 27, 2015, notice of acceleration in compliance with § 22 of the *Deed of Trust* was issued but not received by Davenport.  Accordingly, there was no acceleration as to which Davenport might have been on constructive notice as in *Redman v.*

*Federal Home Mortgage Corp.*, 765 So.2d 630 (Ala. 1999).[38]  *See*
*Dysart*, 729 F. App'x at 726-27; *In re Sharpe*, 391 B.R. 117, 147
(Bankr. N.D. Ala. 2008).

In short, Djourabchi and Welt did not effect a proper
acceleration of the debt prior to Davenport's tendering the
$60,980.

     3.  *Notice of Intent to Pay the Note*

Davenport contends that he did provide notice of prepayment
as required by ¶ 4 of the *Note*.  Paragraph 4 of the *Note* permits
Davenport to prepay the *Note* if Davenport "deliver[s] to Creditor
notice of intent to prepay at least 20 (twenty) days in advance
of [Davenport's] intended date or prepayment."  Paragraph 4
further provides that "Notice of Prepayment will expire if

---

[38]  As noted in *Dysart v. Trustmark Nat'l Bank*, 729 F. App'x
722, 726-27 (11th Cir. 2018):

> In *Redman*, before accelerating the loan on a divorced
> couple's home, the lender fulfilled its disclosure
> obligations by sending, through certified mail, a notice
> of default to the home's address.  *Id.* at 634. In an
> ejectment and wrongful foreclosure action, the ex-wife
> claimed that the bank failed to provide proper notice of
> the default because although she lived at the home she
> never received the notice.  *Id.*  The Alabama Supreme
> Court, after finding that the bank had fulfilled its
> disclosure obligations, rejected the ex-wife's argument.
> Instead, the Court relied on the fact that the ex-wife
> had actual knowledge of the information that the bank was
> required to disclose, explaining that she could not
> "close[ ] [her] eyes to avoid 'discovery' of the truth
> that was reasonably apparent."  *Id.* at 635.

prepayment is not made on the date stated therein."

Davenport contends that ¶ 4 does not state what must be in the notice, but the last sentence in ¶ 4, "[n]otice of Prepayment will expire if prepayment is not made on the date stated therein," clearly shows that a date in which the prepayment will be made must be included. Davenport informed Djourabchi and Welt that he intended to pay off the *Note* sometime toward the end of his bankruptcy case. Davenport did not, however, provide a date on which he planned to make the prepayment. Therefore, Davenport's notice was insufficient under the terms of ¶ 4 of the *Note*.

Furthermore, the purpose of the notice under ¶ 4 was not met by Davenport's general indication that he intended to pay off the *Note* at some point in six years. The purpose of the notice provision is to allow Djourabchi and Welt time to calculate all that is owed under the *Note* and prepare the account for closing. Additionally, it gives them a time to expect the prepayment to ensure that the payment is made in the proper account at the time stated within the notice given by Davenport. A claim of intent to pay off the *Note* in six years does not allow for such calculation and oversight. It is impossible to know how much would be owed on a *Note* in a six-year period. Djourabchi and Welt could have calculated the principal and the interest on principal, assuming all payments were made on time, but could not

70

predict what would be any required late fees, attorney's fees, and other fees and expenses allowed under the *Note* and any interest on such fees and expenses.

Furthermore, a statement of intent to pay the *Note* at some indefinite point in the future is no notice at all.  No one knew exactly when Davenport would finish his plan.  It could have been at any point within a five-year period, because a chapter 13 plan may not extend longer than five years, but Davenport could have finished his plan early.  It is also unclear if Davenport gave notice that he would pay off the *Note* before he finished his plan, or shortly thereafter.

4.  *Even if the Issue of Notice did not bar Prepayment, the Rejection of the Tender was Proper*

Davenport deposited into Djourabchi and Welt's bank account on May 27, 2015, a check for $60,980.00, an amount that  was more than the court later held was owed under the *Note*.  Davenport contends that the debt should be deemed to have been satisfied except for that $60,980.00 and to have been discharged as to amounts coming due afterwards.

An obvious point is that the deposit did not effect an accord and satisfaction because Djourabchi and Welt rejected the deposit once they discovered it, and there was no acceptance of the deposit with the understanding that the tender was accepted as full payment.  *See Pierola v. Moschonas*, 687 A.2d 942, 947 (D.C. 1997); *Curtin v. United Airlines, Inc.*, 120 F. Supp. 2d 73,

71

76 (D.D.C. 2000), *aff'd*, 275 F.3d 88 (D.C. Cir. 2001).

Nor did the deposit effect a discharge of the debt via D.C. Code § 28:3-311 ("Accord and satisfaction by use of instrument"). I need not decide whether Davenport's deposit of the $60,980.00 check directly into Djourabchi and Welt's bank account could be viewed as a payment via an instrument, and whether Djourabchi and Welt could be viewed as having obtained payment of the instrument (by having previously agreed that Davenport could make direct deposits into their account) such that § 28:3-311 could be viewed as applying.  Even if § 28:3-311 applied, the debt was not discharged via the instrument because on June 16, 2015, within 90 days after payment of the instrument via its direct deposit, Djourabchi and Welt tendered repayment of the $60,980.00 to Davenport.  *See* D.C. Code § 28:3-311(c)(2) (permitting claim to not be discharged if the claimant "proves that within 90 days after payment of the instrument, the claimant tendered repayment of the amount of the instrument to the person against whom the claim is asserted").

Davenport contends that pursuant to D.C. Code § 28:3-603, and specifically D.C. Code § 28:3-603(b), the debt was terminated by his tender of the $60,980.00.  D.C. Code § 28:3-603 provides:

> (a) If tender of payment of an obligation to pay an instrument is made to a person entitled to enforce the instrument, the effect of tender is governed by principles of law applicable to tender of payment under a simple contract.

72

(b) If tender of payment of an obligation to pay an instrument is made to a person entitled to enforce the instrument and the tender is refused, there is discharge, to the extent of the amount of the tender, of the obligation of an indorser or accommodation party having a right of recourse with respect to the obligation to which the tender relates.

(c) If tender of payment of an amount due on an instrument is made to a person entitled to enforce the instrument, the obligation of the obligor to pay interest after the due date on the amount tendered is discharged. If presentment is required with respect to an instrument and the obligor is able and ready to pay on the due date at every place of payment stated in the instrument, the obligor is deemed to have made tender of payment on the due date to the person entitled to enforce the instrument.

By reason of D.C. Code § 28:3-306(a), the common law of the District of Columbia governs what is an effective tender for purposes of the other provisions of § 28:3-306. It is well established that a tender, to be effective, must be unconditional. *Davidge v. Simmons*, 266 F. 1018, 1019 (D.C. Cir. 1920). *See also Gause v. C.T. Mgmt., Inc.*, 637 A.2d 434, 438 (D.C. 1994). A tender of an amount conditioned on its being treated as fully paying the debt imposes a condition, and is not a proper tender. *Davidge*, 266 F. at 1019. 1019.[39]  Here,

---

[39]   "The debtor cannot insist that the creditor shall admit that no more is due in respect of the debt for which the tender is made." *Davidge*, 266 F. at 1019, quoting *Henderson v. Cass Cty.*, 18 S.W. 992, 994 (1891). *See also Platsis v. Diafokeris*, 511 A.2d 535, 537-38 (Md. App. 1986)("Thus, a tender which contains a condition 'which would prejudice the creditor's right [, *i.e.*, one] that a payment shall be taken in full discharge', is conditional."  quoting 15 Williston, A Treatise on the Law of Contracts, § 814 (3d ed. 1972)).

73

Davenport's check deposited into the account indicated that the payment was payment in full of the debt, and under *Davidge*, that was an impermissible condition.  Even if I were free to follow decisions from jurisdictions other than the District of Columbia that take the view that accompanying a tender with a request that the payment be treated as fully satisfying the debt does not make the tender conditional,[40] and I were to agree with that view, that would not alter the outcome.

That is because a tender is not effective to discharge a debt "if the creditor in good faith, even though erroneously, claims a greater amount due than is later found to be actually due and owing, where the acceptance of the lesser amount involves an admission that the amount tendered is sufficient."  *First Nat. Bank v. Britton*, 94 P.2d 896, 898 (Okla. 1939) (remanding case

---

[40]   *See Bank of Am., N.A. v. SFR Investments Pool 1, LLC*, 427 P.3d 113, 118 (Nev. 2018), as amended on denial of reh'g (Nov. 13, 2018), stating:

In addition to payment in full, valid tender must be unconditional, or with conditions on which the tendering party has a right to insist.  74 Am. Jur. 2d Tender § 22 (2012).  "The only legal conditions which may be attached to a valid tender are either a receipt for full payment or a surrender of the obligation." *Heath v. L.E. Schwartz & Sons, Inc.*, 203 Ga.App. 91, 416 S.E.2d 113, 114-15 (1992); *see also Stockton Theatres, Inc. v. Palermo*, 179 Cal.App.2d 323, 3 Cal.Rptr. 767, 768 (1960) (tender of entire judgment with request for satisfaction of judgment was not conditional); *cf. Steward v. Yoder*, 86 Ill.App.3d 223, 41 Ill.Dec. 709, 408 N.E.2d 55, 57 (1980) (concluding tender with request for accord and satisfaction was conditional, but not unreasonable).

74

for a determination of whether the bank, in good faith, believed that a larger amount was due when it refused the tender). *See also Reynolds v. Price*, 71 S.E. 51 (S.C. 1911) ((holding that "if a mortgagee refuses a tender, not arbitrarily or for a wrongful purpose, but in good faith, under the honest belief, based upon reasonable grounds, that more is due him than has been tendered, refusal of the tender will not operate to discharge his lien."). When Djourabchi and Welt discovered the attempted tender, I cannot conclude that they were acting in bad faith in refusing the tender.  At that juncture, they were operating under the erroneous but innocent assumption that interest was payable in advance, and that they were entitled to reimbursement of certain

fees and expenses they had paid.[41]   Davenport has not advanced a

persuasive argument to explain how Djourabchi and Welt could be

treated as lacking good faith in rejecting the tender.   If

Djourabchi and Welt had accepted the payment, they would have

lost their rights to the amounts they believed that they were

entitled to under the *Note*.   Djourabchi and Welt were not

required to accept Davenport's calculation of the final amount

owed even if Davenport's calculation was close to, and exceeding,

the final amount the court allowed.

In any event, Davenport did not have the right to pay the

debt in full prior to maturity without first following the

---

[41]   The evidence for the hearing on the objection to the
proof of claim included Djourabchi and Welt's "Ongoing
Accounting" showing various expenses and attorney's fees
incurred.   That exhibit shows that as of June 1, 2015, preceding
the rejection of the tender, Djourabchi and Welt had paid
$8,692.00 in such expenses and fees.   Based on the "Ongoing
Accounting," they believed that Davenport had paid none of these
fees and expenses.   There was never a showing of bad faith in
Djourabchi and Welt's belief that Davenport had been in default
under § 11 of the *Deed of Trust* when the first mortgagee,
Bayview, instituted a foreclosure proceeding, and Djourabchi and
Welt legitimately believed that they had a right to fees incurred
in addressing that default.   Under § 9 of the *Deed of Trust*, they
were entitled to recover for "paying reasonable attorneys' fees
to protect [their] interest in the Property and/or rights under
this Security Instrument, including its secured position in a
bankruptcy proceeding."   Until this court disallowed those
prepetition fees and expenses, Djourabchi and Welt acted in good
faith in treating the fees as owed to them.   Although the court
disallowed such expenses and fees (for lack of time records
permitting the court to determine the reasonableness of the fees
and expenses), there has been no showing of bad faith regarding
Djourabchi and Welt's belief, when they rejected the tender, that
the fees and expenses were owing.

procedures required under the *Note* for giving notice of the intent to prepay the debt, and in rejecting the tender, Djourabchi and Welt could reasonably believe, in good faith, that there had not been proper notice.  In rejecting the tender, Aronson's letter did not invoke Davenport's failure to give advance notice of an intended payment date, but that does not bar Djourabchi and Welt from now pointing to the lack of notice as making rejection of the tender appropriate.

Accordingly, Djourabchi and Welt were not required to accept Davenport's check deposited into their account on May 27, 2015.

F

STANDARDS OF REASONABLENESS OF THE FEES

Even though they were not required to file a statement of postconfirmation obligations under Rule 3002.1, Djourabchi and Welt have sought allowance of any such amounts.  As to fees for which Davenport became liable postconfirmation, Djourabchi and Welt set forth in their *Application for Fees and Expenses* (Dkt. No. 137), that through December 2016, $32,332.00 in fees for Aronson work and $20,471.00 for Russell's work, for a total of $52,803.00 in legal fees, had been incurred and attached invoices for those fees,[42] and that $9,929.10 in expenses had been

---

[42]   These amounts failed to take account of a $400 writeoff by Aronson on 02/01/2016 applied to postpetition fees and Russell's agreement with Djourabchi and Welt to cap fees at $15,000.00.

incurred.  There was no obligation to seek such fees and expenses because Rule 3002.1 did not apply.  However, the parties have treated the *Application for Fees and Expenses* as the equivalent of an application under Fed. R. Bankr. P. 2016.[43]  Those fees and expenses are now in play.

A secured creditor bears the burden of establishing that the attorneys' fees it seeks are reasonable.  *See In re Gwyn*, 150 B.R. 150, 154 (Bankr. M.D.N.C. 1993); *In re Davidson Metals, Inc.*, 152 B.R. 917 (Bankr. N.D. Ohio 1993), *aff'd*, 65 F.3d 168 (6th Cir. 1995).  Davenport contends that Djourabchi and Welt were not entitled to reimbursement of certain attorney's fees because they had not been successful in litigating several of their claims.  Davenport points out that he was successful in objecting to Djourabchi and Welt's Proof of Claim, in opposing Djourabchi and Welt's motion to dismiss, and in defeating their objection to confirmation of his amended Chapter 13 plan.

As noted above, the issue of whether attorney's fees incurred under a contract during the postpetition period preceding confirmation are recoverable under 11 U.S.C. § 506(b) is a federal question.  *In re A & P Diversified Tech. Realty, Inc.*, 467 F.3d 337, 341 (3d Cir. 2006).  However, because 11 U.S.C. § 506(b) applies to only preconfirmation components of an

---

[43]  I need not decide whether the fees could only be sought via a Rule 2016 application.  *See In re Biazo*, 314 B.R. 451, 459 (Bankr. D. Kan. 2004).

78

oversecured claim, and Davenport's liability to reimburse
Djourabchi and Welt for their payment of fees arose
postconfirmation, § 506(b) does not come into play.  *See Hoopai*,
581 F.3d at 1101.  The reasonableness of the fees for which
Djourabchi and Welt seek reimbursement, a reimbursement
obligation that arose postconfirmation, is thus governed by
nonbankruptcy law (here, District of Columbia law).

1. *Reasonableness of Fees Under District of Columbia Law*

Some of the approaches of Federal law and District of
Columbia law regarding reasonableness of attorneys' fees appear
to be the same.  However, Federal law regarding reasonableness of
attorneys' fees is often in the context of a statute awarding
reasonable fees, whereas, here, we are dealing with District of
Columbia law as applied to a contract, and specifically a
contract between a mortgagee and a mortgagor under a *Deed of
Trust*.  That makes a difference.  Regarding the recovery of
reasonable legal fees pursuant to deed of trust provisions, the
rule in the District of Columbia was set forth in *Manchester
Gardens, Inc. v. Great W. Life Assur. Co.*, 205 F.2d 872, 977-78
(D.C. Cir. 1953), as follows:

> [W]here the merit or necessity of the creditor's claim or
> defense is successfully challenged, courts may decline to
> enforce attorney's fee provisions.  When contractual
> provisions for payment by a debtor of his creditor's
> attorney's fees and costs are invoked, such payment
> should not be enforced in the full amount of the
> creditor's legal expenses (even though actually incurred,

79

and reasonable in amount) where his claims or defenses
giving rise to such expenses lack substantial merit. In
no event should the sum allowed be so large as to amount
to an undue penalty for taking one's grievance to the
courts. And if the creditor has benefitted by having a
doubtful question of law resolved, thus reducing the area
of potential future dispute, the debtor should bear only
a fair portion of the burden.

[Footnotes omitted.] In footnote 14 to this passage, the Court of

Appeals elaborated on the observation concerning not awarding

full fees when the mortgagee's claims lack substantial merit:

For example, in *Tyler v. Walker*, 1898, 101 Tenn. 306, 47
S.W. 424, the debtor, who had agreed that, "if suit is
brought on this note, we will pay all attorney's fees and
costs of collecting", brought suit to enjoin foreclosure
on the ground that the creditor was usuriously seeking to
force payment of more than the amount due. The creditor
filed a cross-bill asking foreclosure together with
attorney's fees and costs. The trial court upheld
plaintiff's claim, finding that his "bill was * * *
properly filed to enjoin the sale." It thereupon denied
the creditor's claim for attorney's fees and costs, even
though it did decree a sale for the amount properly
owing. The latter ruling was affirmed on appeal. The
court held that "such fee is not collectible when suit is
needlessly brought, or when it is brought to enforce an
unjust demand, or to coerce more than is actually and
justly due." It thought defendant's cross-bill was not
only brought to coerce more than actually due, but was
also unnecessarily brought, "as the trust deed could have
been enforced out of court for the amount legally due."
*See also D. A. Tompkins Co. v. Monticello Cotton Oil Co.*,
[137 F. 625, 631 (C.C. S.D. Ga. 1905)] ("Finding the
(debtor's) defense in part, at least, meritorious, the
court feels obliged to disallow the (creditor's) claim
for attorney's fees * * * "); *United States v. Reed*, [31
A.2d 673, 675 (D.C. 1942)]; *cf. Wright v. Market Bank*,
Tenn. Ch. App. 1900, 60 S.W. 623; *Peebles v. Yates*, 1906,
88 Miss. 289, 40 So. 996.

The rule of *Manchester Gardens* has been upheld over the years.

See *Wisconsin Ave. Assocs., Inc. v. 2720 Wisconsin Ave.*

80

*Coop. Ass'n, Inc.*, 441 A.2d 956, 965 (D.C. 1982); *Singer v. Shannon & Luchs Co.*, 779 F.2d 69, 71 (D.C. Cir. 1985) (stating "it is clear that even when a party is entitled to attorneys' fees under the terms of a contract, it may nonetheless be denied an award if it is unsuccessful on the merits of its claim."); *Fleming v. Carroll Pub. Co.*, 581 A.2d 1219, 1228 (D.C. 1990).

In arguing that they should be allowed to recover fees in full, Djourabchi and Welt relied on *Barron & Newburger, P.C. v. Texas Skyline, Ltd. (In re Woerner)*, 783 F.3d 266, 277 (5th Cir. 2015), in which the court held that 11 U.S.C. § 330 "explicitly contemplates compensation for attorneys whose services were reasonable when rendered but which ultimately may fail to produce an actual, material benefit." *In re Woerner* addressed a question under Federal law, the need under 11 U.S.C. § 330 for estate professionals not to be subjected to 20-20 hindsight as to what was reasonable in pursuing litigation on behalf of the estate, and thus being entitled to receive compensation from their client, the estate, despite having failed to prevail in litigation.

Here, in contrast, the issue is not whether Djourabchi and Welt's attorneys are entitled to collect fees from their clients, Djourabchi and Welt. Instead, the issue is one regarding attorney's fees incurred by a mortgagee in pressing a claim for reimbursement of fees against a mortgagor for far more than was

owed,[44] and when permitting a recovery of the fees would penalize the mortgagor who was fully entitled to show that the mortgagee's claim was invalid in large part, with the recovery of fees subject to the standards of *Manchester Gardens* under District of Columbia law.

Even if § 506(b) applied, the lodestar analysis under *Copeland*, 641 F.2d at 891, is sufficiently flexible that it can take into account the difference between an estate professional's seeking compensation from its client (the bankruptcy estate) and a mortgagee's seeking against a mortgagor fees the mortgagee had incurred, and, in that light, disallow fees when the mortgagee pursues fees that are substantially inflated and in large part lack any substantial merit.

   2.  *Decisions Regarding Reasonableness of Fees Under § 506(b) as Bearing on Reasonableness Under District of Columbia Law*

Djourabchi and Welt and their expert witness appear to have assumed that § 506(b) would control the reasonableness of fees and relied on decisions applying Federal law.  Consideration of those decisions may be appropriate if District of Columbia law

---

   [44]  Other than attorney's fees, Djourabchi and Welt's proof of claim asserted that as of the petition date Davenport owed $80,000 in principal and $12,682.97 in late fees, a total of **$92,682.97.**  With postpetition interest the allowed secured claim, and Disregarding attorney's fees, the allowed secured claim (including postconfirmation interest) came to **$55,717.03** as of confirmation of the plan.  (The attorney's fees asserted on the proof of claim were disallowed for lack of time records.)

82

would take the same approaches as set forth in those decisions.
Under Federal law, a court's analysis in determining whether a
fee is reasonable always begins with the "lodestar." *Copeland v.
Marshall*, 641 F.2d 880, 891 (D.C. Cir. 1980).  The lodestar is
generated by multiplying the reasonable number of hours expended
by a reasonable hourly rate.  *Id.*  Once the lodestar is
calculated, the court may then adjust the fee after considering
the twelve factors laid out in *Johnson v. Georgia Highway
Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974).  Under
District of Columbia law, a lodestar approach is generally used
in evaluating a recovery of reasonable fees under a contractual
provision calling for a recovery of reasonable fees. *See James G.
Davis Constr. Corp. v. HRGM Corp.*, 147 A.3d 332, 346 (D.C. 2016).
There, the Court of Appeals upheld a 15% reduction of attorney's
fees based on the overall extent of success, and quoted an
earlier decision holding that an approach of that character was
appropriately "tied to the overall degree of success ... [rather
than] a mere mathematical" calculation and that "where 'a
plaintiff has achieved only partial or limited success,' the
judge may adjust the fee to reflect the level of success, and in
that regard should consider . . . whether 'the plaintiff
achieve[d] a level of success that makes the hours reasonably
expended a satisfactory basis for making a fee award.'"
(Citations omitted.)  In calculating the reasonable number of

hours in its lodestar calculation, the number of hours actually expended does not necessarily equate to the reasonable number of hours expended.  *Copeland* warns "[i]t does not follow that the amount of time *actually* expended is the amount of time *reasonably* expended."  641 F.2d at 891.  *Copeland* further iterates:

> Thus, no compensation is due for nonproductive time. For example, where three attorneys are present at a hearing when one would suffice, compensation should be denied for the excess time. **Similarly, no compensation should be paid for time spent litigating claims upon which the party seeking the fee did not ultimately prevail**.

*Id.* at 891-92 (emphasis added).

Nevertheless, attorney's fees being sought under the Federal standard of reasonableness under § 506(b) are not per se unreasonable because the actions are unsuccessful.  *In re Makris*, No. 2:9-005911, 2011 WL 499948, at *4 (D.N.J. February 10, 2011). Under § 506(b), courts have found that reasonableness has two facets: "(1) the itemized fees themselves must be reasonable, and (2) the creditor's actions must be reasonable."  *In re West Elec., Inc.*, 158 B.R. 37, 40 (Bankr. D.N.J. 1993).  However, the creditor must not impede the debtor's successful bankruptcy by unreasonably "saddling the debtor with attorney's fees and expenses."  *Ryker v. Current*, 338 B.R. 642, 651 (D.N.J. 2006), *aff'd sub nom. In re Ryker*, 06-1872, 2007 WL 2138590 (3d Cir. July 27, 2007).  As noted in *In re Gwyn*, 150 B.R. 150, 155 (Bankr. M.D.N.C. 1993):

84

> One purpose of Section 506(b) is to ensure that estate
> assets are not squandered by oversecured creditors, who,
> believing that the debtor will be required to foot the
> bills, fail to exercise restraint in the attorneys' fees
> and expenses they incur, perhaps exhibiting excessive
> caution, overzealous advocacy and hyperactive legal
> efforts.

(Citations omitted.)  In *In re Nicfur-Cruz Realty Corp.*, 50 B.R.

162, 169 (Bkrtcy. S.D.N.Y. 1985), the court held that "it is

inherently unreasonable to ask a debtor to reimburse attorneys'

fees incurred by a creditor that are not cost-justified either by

the economics of the situation or necessary to preservation of

the creditor's interest in light of the legal issues involved."

The court must independently investigate the request to determine

its reasonableness and has the responsibility for avoiding waste

of estate assets at the hands of the secured creditor who,

knowing that the estate must foot the bills, fails to exercise

restraint in taking actions in the case that were not reasonably

necessary to protect its interest.  *See In re Riker Industries,*

*Inc.*, 122 B.R. 964, 970 (Bankr. N.D. Ohio 1990).

Here, a substantial equity cushion existed to protect

Djourabchi and Welt's security interest.  "The size of a

creditor's equity cushion is an underlying factor in the

reasonableness determination, and must be assessed when

considering the above factors.  If the equity cushion is large

enough that there is no appreciable risk that a creditor will not

be paid, courts will tend to view large fee claims as being

exorbitant because there is no purpose in engaging in legal

maneuvers." *In re PCH Assocs.*, 122 B.R. 181, 203 (Bankr.

S.D.N.Y. 1990) (citations omitted).  "[W]here services are not

reasonably necessary or where action is taken because of an

attorney's excessive caution or overzealous advocacy, courts have

the right and the duty, in the exercise of their discretion, to

disallow fees and costs under § 506(b)." *In re Wonder Corp. of

America*, 72 B.R. 580, 591 (Bankr. D. Conn. 1987), *aff'd*, 82 B.R.

186 (D. Conn. 1988).  *See also In re Kroh Bros. Dev. Co.,* 105

B.R. 515, 521 (Bankr. W.D. Mo. 1989).  As stated in *In re

Dalessio*, 74 B.R. 721, 723 (B.A.P. 9th Cir. 1987):

> The key determinant is whether the creditor incurred
> expenses and fees that fall within the scope of the fees
> provision in the agreement, and took the kinds of actions
> that similarly situated creditors might reasonably
> conclude should be taken, or whether such actions and
> fees were so clearly outside the range as to be deemed
> unreasonable. The bankruptcy court should inquire
> whether, considering all relevant factors including
> duplication, the creditor reasonably believed that the
> services employed were necessary to protect his interests
> in the debtor's property.

In other words, a court must determine whether a creditor took

actions that other similarly situated creditors would have taken

and "whether such actions and fees were outside the range so as

86

to be deemed unreasonable." *Ryker v. Current*, 338 B.R. at 651

(quoting *West Elec.*, 158 B.R. at 40).

Therefore, contrary to Katz's opinion expressed at one point

during the trial, the issue is not whether the creditor's

position in litigation passed muster under Fed. R. Bankr. P. 9011

(the analog of Fed. R. Civ. P. 11).  Although a position might

pass muster under Rule 9011, fees could still be denied under

§ 506(b) if unreasonable under the case law discussed above.  *See

In re Wonder Corp. of Am.*, 109 B.R. 18, 27 (Bankr. D. Conn. 1989)

("the standards for imposing sanctions under Rule 9011 . . . are

different from those in a § 506(b) analysis").

At a minimum, District of Columbia law would disallow

attorneys' fees that are unreasonable under the foregoing

principles applicable under § 506(b).  Moreover, under District

of Columbia law as set forth in *HRGM Corp.*, a court has

discretion under the lodestar analysis to adjust the fees awarded

based on the overall degree of success.  However, based on

*Manchester Gardens*, a court's discretion under District of

Columbia law to disallow fees as unreasonable when a mortgagee

has been unsuccessful is much broader.

87

G

REASONABLENESS OF THE FEES AT ISSUE

1.  *Fees for General Work Regarding Bankruptcy Case*

Part of the fees were for the ordinary type of work that a creditor's counsel would perform in a bankruptcy case.  I will allow $3,080.00 for such work.  These consist of the following time entries: first five entries: "Tel. Client $200.00;" "Review zoning,[45] draft entry of appearance $160.00;" "Tel. client, email counsel $200.00;" "Tel. client $80.00;" "Research bad faith chapter 13 filing $320.00;" then "11/09/2015 Attend 341 meeting $1,000.00;" and "File POC [Proof of Claim] $80.00;" followed by "11/30/2015 Review objection to confirmation, draft objection $200.00;"[46] "12/14/2015 Review amended plan, responses $120.00;" "12/28/2015 Review amended schedules $80.00;" "12/31/2015 Review

---

[45] The "Review zoning" entry is somewhat puzzling, but may have related to verifying the zoning was consistent with the value of the property, pertinent to whether Djourabchi and Welt were oversecured.  With $160.00 charged for the entire time entry, I will treat this time entry as typical initial examination of the case and thus reasonable.

[46] It is only the fees for the objection to Davenport's amended plan that were unreasonable.  There were reasonable grounds to object to the initial proposed plan.

88

order, opinion,[47] objection[48] $160;" "01/12/2016 Tel. client

$200.00;" and "01/15/2016 Court appearance [$600.00]."[49]   The

remaining work is addressed below: the work on the motion to

dismiss, the objection to confirmation of the amended plan, and

defending against the objection to claim.

> 2.  *Fees for the Motion to Dismiss*

Fees for the pursuit of Djourabchi and Welt's unsuccessful

motion to dismiss must be denied under District of Columbia law

and would be denied even if the Federal standard of

reasonableness under § 506(b) were applied.[50]   The motion to

dismiss the case sought dismissal on the basis of bad faith.   The

grounds asserted for finding bad faith were: (1) this case was

---

[47]   The opinion was the memorandum decision in the prior
bankruptcy case denying Davenport's motion seeking to have the
court determine whether any arrears were owed.

[48]   The objection was the objection to the proof of claim
filed on December 30, 2015.

[49]   The amount billed was $2,640.00 but for reasons
explained later, the hearing was prolonged based on the
unreasonable motion to dismiss and the unreasonable objection to
confirmation.

[50]   District of Columbia law, not § 506(b) governs the
reasonableness of the fees.   Davenport had no obligation to
reimburse fees until Djourabchi and Welt paid the fees and gave
him notice of the payment, requesting reimbursement.   Davenport
was not given notice of payment of fees until after confirmation
of the plan.   Accordingly, his reimbursement obligation is a
postconfirmation liability, and § 506(b) does not apply to that
obligation.

essentially a two-party dispute; (2) the case came on the heels
of Davenport's first bankruptcy case; (3) the case was filed on
the eve of foreclosure; (4) the debtor had changed his residence
from another property to the Property securing the loan at issue;
and (5) Davenport was barred by 11 U.S.C. § 1322(b)(2) from
modifying the lien on the Property because it is on his principal
residence and he would not be able to make a cure under 11 U.S.C.
§ 1322(b)(5) within a reasonable time.  A reasonable creditor
would not have advanced these meritless arguments and viewed them
as necessary to protect its interest (which, here, was
substantially oversecured).  *See Wonder Corp.*, 72 B.R. at 592
(opposition to the disclosure statement and plan was a "blatant
and totally unproductive obstruction in the administration of
this case" and no § 506(b) fees would be allowed for such
services).  In any event, under *Manchester Gardens*, fees for
pursuing the motion ought not be allowed because the motion
lacked "substantial merit."

First, nothing in the Bankruptcy Code bars a mortgagor from
filing a Chapter 13 plan even if the mortgagee is the only
creditor (which was not the case here).  A principal purpose of

90

Chapter 13 is to save the debtor's home from foreclosure.[51]

Second, filing this case after Davenport had completed plan
payments in the first case was not bad faith.  This was not a
case of filing a new case on the heels of a bankruptcy case
dismissed for failure to make plan payments.  In Davenport's
first bankruptcy case, Djourabchi and Welt filed a proof of claim
for only $80,000, with no unpaid interest, late fees, or
attorney's fees, even though the proof of claim form had elicited
a statement of outstanding arrears.  Had they asserted an arrears
claim for such items, Davenport's plan had sufficient funds to
cure any such arrears, and he could have amended his plan to
provide for a cure of such arrears (if any existed).  Davenport's
confirmed plan in that case left the claim unaltered (except for
the automatic stay of 11 U.S.C. § 362(a)) and provided that
Davenport would deal with the claim by making payments directly
to Djourabchi and Welt outside of the plan.  It was not bad faith
to file this case when there was a dispute as to whether any
arrears existed[52] and that dispute had not been resolved in the

---

[51]  This is not a Chapter 11 case in which 11 U.S.C.
§ 1129(a)(10) imposes a plan-confirmation requirement that if
there is an impaired class of creditors, there must be at least
one accepting class.

[52]  As will be seen, Davenport was *not* in arrears.

first case.[53]

Third, Davenport filed his petition commencing this case on October 14, 2015, six days before the foreclosure date of October 20, 2015. There was no bad faith in commencing this case in order to stay the foreclosure sale from going forward and to address any mortgage arrears that existed.

Fourth, that Davenport represented that he had changed his residence from another property to the Property securing the loan at issue did not come close to smacking of bad faith. Davenport credibly testified that he has resided at the Property since mid-2012. Djourabchi and Welt presented no evidence sufficient to show that Davenport was not residing at the Property. If Davenport was not actually living in the Property, having someone make observations from the street during evening hours ought to have sufficed to verify that. Moreover, Davenport gained and lost nothing by asserting that the Property was his principal

_____

[53]   After having completed plan payments in the first case Davenport had filed an *Amended Motion for Determination of Final Cure and Mortgage Payment re: Rule 3002.1* in the first case on July 15, 2015, in an effort to determine how much remained owing on the loan. However, the court had not decided that *Amended Motion* prior to the commencement of foreclosure proceedings and the commencement of this second bankruptcy case shortly before the date of the scheduled foreclosure sale.

residence[54] because he had the right to treat the allowed secured claim on the Property under § 1325(a)(5)(B) whether the Property was his principal residence or not.

Fifth, by conceding that the Property was his principal residence, Davenport was subject to the general bar of 11 U.S.C. § 1322(b)(2) from modifying the lien on the Property. However, the loan was due to mature in September 2016, thus making the lien subject to an exception in 11 U.S.C. § 1322(c)(2) to that general bar. Davenport was thus entitled to invoke 11 U.S.C. § 1322(c)(2) to treat the claim under 11 U.S.C. § 1325(a)(5)(B), which allowed him to provide for full payment of the claim over time with a plan-post-effective-date interest rate on the allowed secured claim assuring that Djourabchi and Welt would receive payments equal in value to the allowed amount of their secured

---

[54]  This bankruptcy case is not a foreclosure action in which Davenport might have enhanced rights (for example, a right to mediation) based on the Property being his principal residence.

claim.[55]    At the hearing of January 15, 2016, on the motion to

dismiss and on confirmation of Davenport's second amended plan,

the court held:

> This is a hearing on confirmation of the debtor's plan.
> The objections that have been raised to confirmation are
> overruled.    The Debtor is entitled to invoke Section
> 1322(c)(2), which means that he may invoke Section
> 1325(a)(5), and the Plan provides for a treatment in
> accordance with Section 1325(a)(5), namely that the
> secured claim will be paid off over time in equal monthly
> payments, with an interest rate designed to get present
> value.

The court then denied the motion to dismiss, finding no bad

faith.

Nevertheless, under the category of *Fees for General Work*

*Regarding Bankruptcy Case* I have allowed $600 for the hearing on

the motion to dismiss and the confirmation of Davenport's plan.

The bulk of the hearing of January 15, 2016, addressed the

---

[55]    Moreover, Davenport was entitled alternatively to
propose a plan providing, as permitted by 11 U.S.C. § 1322(b)(5),
to cure the arrears over a reasonable period of time, and to deal
with the balance of the claim via payments made by Davenport
directly to Djourabchi and Welt.    Davenport had sought a ruling
in the prior case regarding the amount owed on the claim but the
court had not yet ruled on that motion, and the foreclosure sale
was imminent.    There was a dispute as to what the arrears were
(as evidenced by the objection Davenport filed on December 30,
2015, to Djourabchi and Welt's claim), and a determination in
that regard (ultimately concluding that as of the petition date
that no arrears were owed) was necessary before it could be said
whether Davenport could cure arrears within a reasonable time.
That issue would have been a confirmation issue, not an issue to
be decided via a motion to dismiss based on an allegation of bad
faith.

assertions of bad faith raised in both the motion to dismiss and
the objection to confirmation.  However, it would have been
reasonable for Aronson to generally object to confirmation (to
put Davenport to his burden of showing that the plan was
confirmable) and to appear at the confirmation hearing to monitor
the court's rulings.  Nevertheless, if Aronson had not raised the
contentions of bad faith and other meritless objections to
confirmation, the hearing would have taken less than one hour.
Accordingly, only $600.00 has been made for attending the
hearing.

The fees allocable to the motion to dismiss total $4,120.00
and will be disallowed.  This consists of "10/26/2015 Research
bad faith chapter 13 filing $320.00;" "10/26/2015 Draft motion to
dismiss $240.00;" "10/27/2015 Draft motion to dismiss $880.00;"
"10/28/2015 Email client $80;" "11/13/2015 Prepare notice, order
$120;" "12/09/15 Review opposition to motion to dismiss $80.00;"
"12/17/2015 Prepare for hearing $120.00;" "01/06/16 Prepare for
hearing $240.00;" and "01/15/2016 Court appearance [$2,040 of the
$2,640 for the hearing on the motion to dismiss and on
confirmation of Davenport's second amended plan)][56]."

---

[56]   The hearing of January 15, 2016, related also to the
objection to confirmation, and under the category of under the
category of *Fees for General Work Regarding Bankruptcy Case* I
have already allowed $600.00 for attending that hearing.

3.  *Fees for the Objection to Confirmation of the
    Amended Plan*

Similarly, the objection to confirmation of Davenport's

amended plan invoked 11 U.S.C. § 1322(b)(2) as barring the

modification of Djourabchi and Welt's claim and repeated the

facts underlying the assertion of bad faith made in the motion to

dismiss.  The objection failed to recognize § 1322(c)(2) as an

exception to § 1322(b)(2) and, as discussed above with respect to

the motion to dismiss, Djourabchi and Welt had no sound basis for

asserting bad faith.  I have already allowed the $120 spent

reviewing the second amended plan on December 14, 2015, but I

will disallow the $120 for preparing the objection to

confirmation on December 29, 2015, and I have already disallowed

all but $600 for time spent at the hearing on January 15, 2016,

which was on both the motion to dismiss and the confirmation of

the second amended plan.

4.  *Fees for Defending the Objection to Djourabchi and
    Welt's Proof of Claim*

I will disallow 90% of the fees for time spent in the first

half of 2016 defending against the objection to claim.

Djourabchi and Welt asserted a claim for $121,813.88.  In my

decision, I adopted the approach of Davenport's expert, Runge,

and I agreed with Runge that Davenport had overpaid on the loan

except for a miscalculation of $2.97.  I held that "[a]lthough

96

Djourabchi and Welt attempted to present contrary expert witness
testimony, that witness's testimony was unpersuasive even if he
could be deemed to have qualified as an expert witness."  *Proof
of Claim Decision* at 11.  The *Proof of Claim Decision* found that
Davenport had never been in arrears, and in fact, had made
payments ahead of time and stayed on top of his payments, and
found that the amount owed as of the petition date was $80,000,
with a credit of $26,422.90 not yet applied.  In *Fleming*, 581
A.2d at 1228 n.22, the court noted:

> The court in *Manchester Gardens* cited as support the case
> of *Tyler v. Walker*, 101 Tenn. 306, 47 S.W. 424 (1898).
> In *Tyler*, the court held that where a promissory note
> provided that "if suit is brought on this note, [debtor]
> will pay all attorney's fees and costs of collecting," an
> attorney's fee was nonetheless not collectible "when suit
> is needlessly brought, or when it is brought to enforce
> an unjust demand, or to coerce more than is actually and
> justly due."  101 Tenn. at 308-09, 47 S.W. at 424.

Djourabchi and Welt's proof of claim asserted a claim for
$92,682.97 plus attorney's fees whereas the allowed secured claim
(before addressing attorney's fees) was fixed as $55,717.03., and
Djourabchi and Welt's position rested on arguments the bulk of
which were without substantial merit.  It was an unjust demand,
seeking to coerce far more than was actually and justly due.
Accordingly, I find that 90% of the fees incurred in defending
against the objection to claim are not owed.

   Assertion of the vastly inflated claim, first in noticing up

97

a foreclosure sale which ought not have been pursued because no
amount was in default (leading, for example, to including the
foreclosure advertisement expense in the proof of claim), and
then pursuing the vastly inflated claim in a proof of claim,
amounted to a breach of Djourabchi and Welt's implicit obligation
of fair dealing.  Disallowance of the bulk of the fees for
defending the excessive claim is warranted as well on that
alternative basis.  *First Atlantic Bldg. Corp. v. Neubauer
Constr. Co.*, 352 So.2d 103 (Fla. 4th DCA 1977) ("It would be an
anomaly to permit a party who breaches a contract to rely on the
same contract to reimburse it for expenses, such as attorney's
fees, which arose out of the breach."), cited with favor in
*Wisconsin Ave. Assocs.*, 441 A.2d at 965, and in *Singer*, 779 F.2d
at 71.

In reaching the conclusion that only 10% of fees should be
awarded for defending against the objection to claim, I have
reviewed anew and taken into account the evidence presented in
the trial of the objection to claim.  A principal and critical
issue was whether the *Note* required Davenport to pay interest in
advance.  Only if interest had been payable in advance would
Davenport have ever been in arrears and incurred the substantial
late fees charged by Djourabchi and Welt.  Djourabchi and Welt's
position on the issue was without substantial merit, and totally

98

unreasonable.  As the court ruled in the *Proof of Claim Decision*,
the "*Note* did not comply with the commercial custom and practice
that prevails when a note calls for payment of interest in
advance."  Moreover, case law makes clear that to make interest
payable in advance, the intention to do so should be expressed in
unambiguous and unmistakable language.  It stands to reason that
a waiver of the general rule that interest is *not* paid in advance
must be in clear and unambiguous terms.  "Surely, a waiver of
such magnitude must be clear and unambiguous."  *Eagle Maint.*
*Servs., Inc. v. D.C. Contract Appeals Bd.*, 893 A.2d 569, 577
(D.C. 2006).  *See also Keller v. Keller*, 171 A.2d 511, 514 (D.C.
1961) ("If the parties intended [such] a waiver . . ., it was an
easy matter for them to state such intention").

Djourabchi and Welt presented as a witness an accountant,
Dmitri Velin, who merely assumed based on the language of the
*Note* that interest was payable in advance despite the *Note*
containing no provision clearly requiring that interest be paid
in advance.  His testimony was baseless.  He testified that he
rested his assumption on the statement in the *Note* that
"[i]nterest is calculated on a monthly basis accruing on the
first calendar day of each month, at 9:00 AM, and will not be
prorated for a daily calculation for any reason."  That

99

assumption was not admissible expert opinion, which the court

properly disregarded as addressing a question of law the court

was to decide based on the evidentiary record (for which Velin's

testimony added nothing of relevance).  Unlike Runge, he did not

testify regarding whether ordinary custom is that absent a clear

contractual provision to the contrary, interest is paid for a

month after the expiration of that month to which the interest

relates.

Moreover, Djourabchi and Welt's position disregarded case

law indicating that to make interest payable in advance, the

intention to do so should be expressed in unambiguous and

unmistakable language.  The *Note* contained no unambiguous and

unmistakable language providing for interest to be paid in

advance.  Davenport ought not have been subjected to the argument

that interest was to be paid in advance.  The silence of the *Note*

as to whether interest was to be paid in advance or in arrears

did not create ambiguity.  Even if the *Note* had been ambiguous on

that score, that would not satisfy the requirement that the *Note*

contain unambiguous and unmistakable language providing for

interest to be paid in advance.

Even if an ambiguity existed and even if an ambiguity could

have permitted resort to extrinsic evidence, the extrinsic

evidence upon which Djourabchi and Welt relied failed to show

that Davenport clearly and unambiguously waived his right to pay
interest in arrears.  Specifically, they relied on Davenport's
having made a payment of $207 on the date of the execution of the
*Note*, and his having made payments of $1,000 a month for many
months (instead of only $700 per month) thus suggesting that he
recognized he was in arrears and was required to pay the penalty
of $300 when he had failed to make a payment in the month of the
$700 in interest due for the month.  Both items failed to support
interest being paid in advance:

- Runge testified without contradiction that it is not
  atypical to pay in advance the interest accruing
  between the date of the execution of a promissory note
  and until the first of the succeeding month (when
  interest would otherwise be due).  In addition, as
  noted in the *Proof of Claim Decision* at 13-14, case law
  confirms that an initial payment of interest in advance
  is not atypical.

- The reliance on the string of payments of $1,000 per
  month proved nothing as Davenport agreed to pay that
  amount each month in exchange for Djourabchi and Welt
  agreeing not to pursue foreclosure based on Davenport
  being in arrears on the first mortgage owed to Bayview.
  Moreover, even if Davenport could be viewed as

> > acquiescing in Djourabchi's view that he was in
> >
> > arrears, that does not bar Davenport from showing that
> >
> > he was *not* in arrears.

That extrinsic evidence did not establish clearly and
unambiguously that Davenport agreed to pay interest in advance.
*See Lacek v. Washington Hosp. Ctr. Corp.*, 978 A.2d 1194, 1200
(D.C. 2009) (conduct of defendant failed to show that it "clearly
and unambiguously waived its right" to pre-filing notice).

Furthermore, the proof of claim rested in part on a failure
to give Davenport credit for several payments he had made.  This
is evidenced by the payments not being included on the *Opposition
to the Motion to Determine Final Cure Amount* (filed on July 27,
2015, in Case No. 09-00772 as Dkt. No. 320),[57] and in their
responses to discovery in this case, all as explained in
Davenport's testimony regarding his painstaking verification of
payments he had made but that Djourabchi and Welt failed to
acknowledge (Ex. No. 31).[58]  Davenport ought not have been
required to pull teeth to have Djourabchi and Welt acknowledge

---

[57]   That *Opposition* is Ex. No. 21 in the objection to proof
of claim trial.  The exhibits for that trial are found at Dkt.
No. 103 in this case.

[58]   I recognize that Djourabchi and Welt's failure to
include the amount of prepetition defaults in their proof of
claim in the 2009 case does not provide a cause of action against
them.  *See In re Joubert*, 411 F.3d 452, 456 (3d Cir. 2005).

various payments he had made.  Djourabchi compounded this offense

by attempting to testify at trial that Davenport's listings of

two $700 payments on Davenport's Exhibit 31 as having been made

in January 2007 and April 2007 were duplicative listings because

Exhibit 31 indicated that each payment had the same check number.

Djourabchi's own accounting clearly verified that two payments of

$700 *had* been made in January 2007 and April 2007.[59]

Djourabchi's testimony that one of the two $700 payments had not

been made was an instance of a lack of fair dealing.

Finally, in his answers to interrogatories (Ex. 25),

Djourabchi conceded that a payment of $1,500 had been made on the

*Note* in January 2007,[60] but at trial he testified that the

payment of $1,500 had been for wood joists and flooring taken out

of Djourabchi and Welt's row house by Davenport who was serving

as Djourabchi and Welt's general contractor in renovating the row

house.  Davenport testified that he agreed to perform the labor

of removing the joists and flooring without charging anything in

---

[59]   It was obvious that Davenport's listing the same check
number for both payments was an error.

[60]   Djourabchi stated at paragraphs 13, 21, and 23 that "on
January 11, 2007, Debtor made a lump sum payment of approximately
$1,500 to Creditor's account to incorporate all forms of
outstanding fees due on the Note as a result of our
communications regarding the accumulating late fees from the very
first payment."

exchange for receiving the joists and flooring.  I found that
Davenport the more credible witness and concluded that he made
the $1,500 payment as a payment on the *Note*.

Under *Manchester Gardens*, a creditor ought not be awarded
fees for attempting to protect a proof of claim for inflated
amounts that did not exist as a valid claim, and for which bulk
of the creditors' evidence and arguments failed to show that the
inflated amounts had any substantial merit.  I will allow 10% of
the fees because Djourabchi and Welt were entitled to examine
Runge's approach to make sure it was correct and were entitled to
verify the payments Davenport was claiming to have made.

In arguing that they should be allowed to recover fees for
defending against the objection to claim, Djourabchi and Welt
relied on *In re Woerner*, 783 F.3d at 277, as entitling them to
compensation because 11 U.S.C. § 330 (dealing with compensation
of estate professionals) "explicitly contemplates compensation
for attorneys whose services were reasonable when rendered but
which ultimately may fail to produce an actual, material
benefit."  However, as discussed previously, *In re Woerner* does
not apply here.  Here, Davenport was justified in taking the
position that the proof of claim was vastly inflated.  The bulk
of the fees incurred by Djourabchi and Welt in defending the
proof of claim was for work in advancing arguments that the court

rejected as unreasonable and without substantial merit, with the
recovery of fees subject to the standards of *Manchester Gardens*
under District of Columbia law.  The testimony of Djourabchi and
Welt's accountant witness, Velin, was baseless and thus of no
value, and attorney's fees for work in regard to Velin ought not
be awarded under *Manchester Gardens*.  And the fees paid to Velin
ought not be recoverable.  Nor under *Manchester Gardens* should
Davenport be charged fees for attorney work on *Note* payments that
were not genuinely in dispute.  In other words, the bulk of the
work ought not be compensated, and 10% of the fees is a fair
amount to treat as reasonable.

Even if § 506(b) applied, the result would be the same.  The
fees I am disallowing are for work that a reasonable creditor
would not have pursued.  As previously explained, the lodestar
analysis under *Copeland*, 641 F.2d at 891, is sufficiently
flexible that it can take into account the difference between an
estate professional seeking compensation from its client and a
mortgagee's seeking against a mortgagor fees the mortgagee had
incurred in failing to prevail on a vastly inflated claim.  In
that light, the standards of § 506(b) and the *Johnson* factors,
488 F.2d at 717-19,  would warrant finding the reasonable fees
are only 10% of the total fees incurred.

The fees for Aronson's work on the objection to claim, after

a $400.00 writeoff, totaled $23,160.00[61] but the entry for $200

on March 3, 2020, included no description of the work, resulting

in only $22,960 of fees with adequate description.  Russell's

fees totaled $17,540.50, but his fees were capped by agreement

with Djourabchi and Welt at $15,000.00.  The total of fees for

work on the objection to claim is thus $37,960.  I will allow

$3,796.00 of the fees and disallow the remaining $34,164.00.

   5.  *Expenses Incurred Prior to 2017*

 As to expenses incurred in 2015 and 2016, I will not award a

recovery of the expense incurred by Joel Aronson of $1,352.40 for

the foreclosure ad because the foreclosure was pursued based on a

vastly inflated claim as to what was owed, such that foreclosure

ought not have been pursued.  I will allow the $100.00 fee

Aronson paid for filing a motion for Russell to appear pro hac

vice.  As to Russell, I will disallow the $1,000.00 expert fee

for Velin's baseless work, but allow the remaining $255.42 of

---

[61] The invoices for Ridberg Aronson LLC attached as Exhibit
E to Djourabchi and Welt's exhibit list (Dkt. No. 194) and
received into evidence were copies of an earlier filing, Dkt. No.
137-5 but were incomplete (missing pages 4 and 5 of 24).
However, I have taken judicial notice of Dkt. No. 137-5 and the
two missing pages.

expenses.[62]   In addition to expenses paid by their attorneys,

Djourabchi and Welt are seeking $9,929.10 in expenses they paid

in the litigation of the objection to their claim.   These include

$3,975.39 in expenses for their travel to depositions or court,

court reporter charges (for depositions and for transcripts), and

a FedEx charge.   These also include $5,953.71 in expenses

relating to Velin (his retainer and fee, airfares, and hotel

expenses).   Because Velin's testimony was baseless, I will not

allow that $5,953.71.[63]   I will allow the remaining $3,975.39 in

expenses.

Thus, regarding fees and expenses incurred in defending

against the objection to claim, I allow fees of $3,796.00 for the

work of Aronson and Russell, allow expenses of $355.42 paid by

Aronson and Russell, and allow expenses of $3,975.39 paid by

Djourabchi and Welt directly for a total allowance of $8,126.81.

I will disallow the remaining fees of $34,164.00 and the

remaining expenses of $8,306.11, for a total disallowance of

---

[62]   Aronson incurred $1,352.40 for the foreclosure ad and a
$100.00 fee for filing a pro hac vice motion for Russell to
appear.   Russell incurred the $1,000.00 fee for Velin and $255.42
in miscellaneous expenses, and Davenport has not challenged the
reasonableness of the $255.42 in miscellaneous expenses.

[63]   Russell's list of expenses he paid, like Djourabchi and
Welt's list of expenses they paid, includes a payment of
$1,000.00 to Velin as a retainer.   I am disallowing the $1,000.00
in both instances.

$42,470.11.  In sum, I allow $8,126.81 in fees and expenses and
disallow $42,470.11 in fees and expenses incurred with respect to
litigating the objection to claim.

> 6.  *Fees and Expenses for Work Opposing the Motion to
>     Modify (as Opposed to Work on the Application for
>     Fees and Expenses)*

After the amount of the claim as of the petition date was
decided by this court in July 2016, Davenport took steps to
assure that he paid the full amount of the allowed secured claim,
that is, the amount of the claim owed on the confirmation date
plus postconfirmation interest of 6% per annum.  He made a large
payment to the Chapter 13 trustee in January 2017 to largely
accomplish that and then filed the instant *Motion to Modify*.  At
that point, the law firm of McNamee, Hosea, Jernigan, Kim,
Greenan & Lynch, P.A. ("McNamee Hosea") began representing
Djourabchi and Welt.

Djourabchi and Welt's *Supplemental Opposition* both opposed
the *Motion to Modify* and included the *Application for Fees and
Expenses*.  I address first the work opposing the *Motion to
Modify*.

Many of the positions Djourabchi and Welt took in the
*Supplemental Opposition* and continued to take in opposing the
*Motion to Modify* have been rejected in large part.  In February

2017, Djourabchi and Welt represented that the court indicated
that under the confirmed plan the credit of $26,422.90 "could be
applied either to principal or **prepaid** interest." *Supplemental
Opposition* (Dkt. No. 137) at 3 (emphasis added).  The court never
made such a statment, and because the confirmed plan was based on
11 U.S.C. § 1325(a)(5)(B), it resulted in a balloon amount as of
the confirmation date, to be amortized over time, with the credit
available to be applied immediately on the confirmation date to
reduce the balance of the allowed secured claim.

    The *Supplemental Opposition* then went on to state: "With
interest of 10.5% accruing on the principal balance of $80,000,
interest accrued during the period on the case would be $8,400.00
for the first year plus an additional 80 days [of interest]
totaling $1,841.10 [and] would equal $10,241.10 in interest or
$6,164.00 more than was paid by the Trustee."  However, the plan
was confirmed only three months and a day after the petition was
filed.  It was obvious that once the plan was confirmed, the plan
provided for interest on the allowed secured claim to be fixed
and owed at only 6% per annum, and that the allowed secured claim
was to be reduced as of the confirmation date by the credit of
$26,422.90.

    Then, in March 2017, Djourabchi and Welt's attorneys
compounded these erroneous arguments by having Djourabchi and

Welt's new accounting expert, Victor Lipnitsky, assume, in
preparing his initial report, that trustee payments were to be
applied only to interest until sufficient payments were received
to satisfy the entire allowed secured claim.  That was contrary
to the fact that by reason of 11 U.S.C. §§ 1322(c)(2)
and 1325(a)(5), the confirmed plan treats the Note as matured,
with the whole allowed secured claim owed on the confirmation
date was to be paid on an amortized basis beginning on the
confirmation date, such that any trustee payment had to be
applied to the balance of the allowed secured claim after
application of the payment to interest that had accrued at 6% per
annum on the allowed secured claim before the date of the
trustee's payment.  Lipnitsky's initial report of May 17, 2017
(Exhibit K) was based on assumptions he was asked to make by
Djourabchi and Welt's counsel, which included an assumption that
payments made by the Chapter 13 trustee beginning January 29,
2016, would be used to pay only interest until the claim was paid
in full, with payments in excess of accrued interest to be

treated as prepaid interest.[64]  Then, after the court issued its
*In Limine Decision*, Lipnitsky prepared a revised report (Exhibit
X) that erroneously treated Davenport's postconfirmation
obligations to reimburse Djourabchi and Welt for fees and
expenses they had paid as part of the allowed secured claim being
paid under the plan (disregarding the fact that the allowed
secured claim is fixed based on the amount owed as of the
confirmation date, and that, as noted in the *In Limine Decision*,
Davenport had no responsibility as of the confirmation date to
reimburse Djourabchi and Welt for fees that had not yet been
paid), and including interest of 6% per annum on such fees and
expenses as they were invoiced.  Then, finally, late on the night
before the trial, he prepared another calculation (Exhibit Z)
that correctly excluded fees and expenses as part of the allowed
secured claim, although the calculation contained certain minor
errors (discussed in footnote 21, *supra*).

---

[64]  Lipnitsky was asked to consider two scenarios and was
asked to assume in Scenario A that the principal amount was
$80,000 and remained $80,000 until the entire debt was paid.
However, as this court has ruled, as of the confirmation date,
the credit on hand of $26,422.90 had to be applied to the
$80,000, reducing the allowed secured claim as of the
confirmation date to $55,717.03.  His Scenario B assumed that the
allowed secured claim stood at $53,577.10 as of January 1, 2016,
but with payments from the trustee to be applied only to interest
until sufficient funds were on hand to pay the entire allowed
secured claim and accrued postconfirmation interest.

On June 30, 2017, Davenport filed his *Motion in Limine Regarding Interpretation of Court's Orders and Application of Payments Made on Account of Creditors' Claim*, noting the erroneous assumptions that Lipnitsky had been asked to make regarding trustee's payments not being applied to principal until the entire debt was paid.  On July 14, 2017, Djourabchi and Welt filed a *Response to Motions in Limine*.  The third part of that initial opposition was titled "The Note Provides that Debtor's Prepayments Are Not to Be Applied to Principal" and failed to acknowledge that Lipnitsky's assumptions were in error in assuming that the credit of $26,422.90, would not be applied to the allowed secured claim as of the confirmation date and that payments from the trustee, after satisfying outstanding interest at 6% per annum, would be applied to the balance of the allowed secured claim.  However, Djourabchi and Welt were correct that the $26,422.90 credit was not to be applied as of the petition date instead of the confirmation date.

On July 21, 2017, Djourabchi and Welt filed a *Supplement to Response to Motions in Limine*, which in its entirety argued that after the plan was confirmed, calling for payment of the allowed secured claim in equal monthly payments, the payments could not be applied to principal until the entire debt was paid.  Plainly, as I had ruled at the confirmation hearing, 11 U.S.C.

112

§ 1322(c)(2) permitted the claim to be modified pursuant to 11 U.S.C. § 1325(a)(5)(B), a modification that resulted in an allowed secured claim that was to be amortized over time in equal monthly payments with an interest rate of 6% on the allowed secured claim assuring present value.  Djourabchi and Welt's argument to the contrary was without substantial merit, and a case of overzealousness, an argument that a similarly situated creditor could not reasonably conclude should be taken.  The fees for pursuing that argument ought not be recoverable under *Manchester Gardens* (and even under the standards of § 506(b) if I were to apply those standards).

Most of the fees incurred in opposing the *Motion to Modify* (to be distinguished from fees incurred in pursuing the *Application for Fees and Expenses*) ought not be awarded.  The *Motion to Modify* is being granted, with Davenport prevailing on the bulk of his approach as to what remained owed under the confirmed plan, and with the bulk of Djourabchi and Welt's positions in that regard lacking substantial merit and being arguments that a reasonable creditor would not have pursued. Some of the issues regarding the *Motion to Modify* required resolution, but under *Manchester Gardens*, 205 F.2d at 878, Davenport ought not suffer a recovery of fees in regard to the

113

*Motion to Modify* that are "so large as to amount to an undue
penalty for taking one's grievance to the courts."  And even if
there were any doubtful questions of law to be resolved, which I
think there were not, Davenport "should bear only a fair portion
of the burden" that Djourabchi and Welt incurred in having
attorneys represent them on the *Motion to Modify*.  *Manchester
Gardens*, 205 F.2d at 878.  Djourabchi and Welt are entitled to a
modest amount of fees and expenses in two regards.  First, they
verified the calculations Runge performed and corrected one of
his erroneous assumptions, which led to a mistake of $325.70, the
difference between the overpayment of $228.00 calculated by
Runge, and the $97.70 shortfall as of January 31, 2017, that I
have calculated.  In contrast, the court rejected the approaches
that Djourabchi and Welt's expert, Lipnitsky, had taken (prior to
his making revisions late on the night before the trial).[65]  As
discussed previously, that $325.70 variance is clearly
insufficient to alter the propriety of granting the *Motion to
Modify*.  Djourabchi and Welt's success of $325.70, which did not

---

[65]  Illustratively, time entries for May 1, 2017, through
May 8, 2017, of $20, $550, $200, $150, $200, $227.50, and $100
appear to have been for working with Lipnitsky and reviewing his
calculations under the erroneous assumptions supplied by
Djourabchi and Welt's attorneys.  That $1,447.50 of fees
(attributable to erroneous assumptions that ought not have been
advanced) ought not be charged to Davenport.

suffice to warrant denying the *Motion to Modify*, hardly warrants an award of any significant part of their fees.  Second, Djourabchi and Welt are entitled to a modest amount of fees for opposing Davenport's suggestion that the $26,422.90 credit should be applied as of the petition date.  Based on their paltry level of overall success in opposing modification of the plan, I will allow 20% of their fees opposing the *Motion to Modify*.

What makes things difficult is that it is hard to split up the time spent on opposing the *Motion to Modify* (determining the amount owed as of confirmation, and whether it had been paid in full) and the time spent on the pursuit of fees and expenses incurred.  Djourabchi and Welt placed in evidence various invoice statements issued by McNamee Hosea, the law firm representing them in all of the litigation commencing in early 2017 regarding the *Motion to Modify* and the *Application for Fees and Expenses*. Sometimes it is fairly easy to categorize work between the two categories.  For example:

- Work with Djourabchi and Welt's expert, Lipnitsky, clearly relates to the *Motion to Modify.*

- Work on the *Supplement to Response to Motions in Limine* filed on July 21, 2017, which entirely raised an argument that the plan did not call for amortizing payments, clearly relates to the *Motion to Modify.*

115

However, other work is largely not easy to categorize.  Bearing

in mind that Djourabchi and Welt bore the burden of proof, I

estimate that as to the work reflected on McNamee Hosea invoices

(which do not include work at the trial), 25% was devoted to the

*Motion to Modify* (including time dealing with addressing the two

experts in that regard, Runge and Lipnitsky, and working with the

Chapter 13 trustee as to her calculations), and 75% was devoted

to the issue of establishing an entitlement to attorney's fees

and expenses (including work addressing Davenport's challenges

based on res judicata, tender, Rule 3002.1, and equitable

estoppel).  The McNamee Hosea fees for invoices in evidence

through the statement for February 13, 2018, aggregate

$26,215.87.[66]  Djourabchi and Welt have not yet sought fees for

periods after February 13, 2018.  Of the $26,215.87 invoiced

through February 13, 2018, 25% or $6,553.97 is estimated to be

for work devoted to the *Motion to Modify*.  Of that, the 20% to be

---

[66]   The *Statement and Notice of Post-Petition Fees and
Expenses Incurred* filed on the Claims Register on November 13,
2017, listed (but did not attach) two invoices that were not
received as evidence as part of Exhibits M and N: the statement
for 8/31/2017 allegedly showing expenses of $24.32 and the
statement of 09/30/2017 allegedly showing fees of $422.50 and
expenses of $5.60.  Without the invoices being in evidence, those
amounts cannot be allowed.  The aggregate $26,215.87 fee figure
and the aggregate $374.44 expense figure, which are based on
invoices in evidence, do not include the amounts listed on the
statements dated as of 08/31/2017 and 09/30/2017.

allowed is $1,310.79.

Expenses billed by McNamee Hosea through February 13, 2018, total $374.44, and 25% will be allocated to the work on the *Motion to Modify*, which comes to $93.61, and 100% of those expenses will be allowed.  The expenses do not relate to any fee to be charged by Lipnitsky (whose work, except late on the night before the trial, was based on erroneous assumptions supplied by Djourabchi and Welt's attorneys, and his fee likely would suffer a lower percentage).

7.   *Attorneys' Fees and Expenses for Work Seeking Fees*

The *Application for Fees and Expenses* sought recovery of the full amount of fees charged by Aronson and by Russell, claiming that $52,803.00 in fees and $9,929.10 in expenses were incurred, and also noted that fees of McNamee Hosea would be incurred in seeking to recover fees.  As noted above, the bulk of the $52,803.00 of fees for work of Aronson and of Russell ought not be recovered.  As to fees charged by McNamee Hosea for working on the *Motion to Modify*, only 20% are being allowed as reimbursable by Davenport.  That leaves the fees incurred in pursuing the recovery of fees.

In determining what were the reasonable fees for pursuing the *Application for Fees and Expenses*, I take into account, on the one hand, that I disallowed the bulk of the fees charged by

117

Aronson's and Russell's law firms as unreasonable and I have disallowed all but 20% of the fees for opposing the *Motion to Modify*. In other words, Davenport had a substantial overall success in opposing the pursuit of those fees. On the other hand, however, Djourabchi and Welt succeeded in defending against Davenport's unsuccessful arguments that fees were barred *in toto*.[67] Accordingly, in the exercise of my discretion under *HRGM Corp.*, 147 A.3d at346, and *Manchester Gardens*, 205 F.2d at 977-78, in awarding reimbursement for fees paid in pursuing reimbursement of prior fees incurred, I will teat 50% of Djourabchi and Welt's payment of fees incurred in pursuing the *Application for Fees and Expenses* as subject to a reimbursement obligation on the part of Davenport (owed by Davenport upon his being given notice of the fees having been paid).

The fees billed by McNamee Hosea through February 13, 2018, total $26,215.87. Twenty-five percent of those fees are being treated as allocable to work on the *Motion to Modify*. The remaining 75% equals $19,661.90. Of that, 50% is $9,830.95.

McNamee Hosea billed expenses of $374.44. I have already

---

[67] For example, they successfully defended against the *Motion In Limine Prohibiting Creditors From Claiming Entitlement to Attorney's Fees* (seeking to bar attorneys fees *in toto*). Their attorneys performed $2,608.00 of work relating to their July 14, 2017, filing in opposition to that *Motion in Limine*.

treated 25% ($93.61) as allocable to the *Motion to Modify* and
will allow those expenses.  I will treat the remaining $280.83 as
allocable to the *Application for Fees and Expenses*, and allow
that $280.83.[68]

Separate and apart from expenses, Djourabchi and Welt seek
to recover interest of $57.51 on a past balance charged by
MacNamee Hosea on July 31, 2017.  It would be unreasonable for
Djourabchi and Welt to recover interest from Davenport for their
own negligence in paying their own bills.

V

WHEN FEES BECAME REIMBURSABLE

Fees and expenses became reimbursable by Davenport only once
Djourabchi and Welt paid the fees and expenses and gave Davenport
notice.  Section 15 of the *Deed of Trust* governed notice, and
generally required that notices to Davenport be sent to the
Property address.  However, once the bankruptcy case was filed,
with Orenstein representing Davenport, McNamee Hosea's
communications with Davenport ought to have been through

---

[68]  These expenses are mostly for PACER charges, copying,
and FedEx charges.  The expert fees of Lipnitsky and Katz have
not been billed and may not be recoverable in full.  For example,
Lipnitsky, through no fault of his own, largely performed work
based on erroneous assumptions supplied by Djourabchi and Welt's
attorneys, and that may warrant a reduction of the amount of fees
paid him and for which reimbursement may be sought.

Orenstein.

Djourabchi and Welt's *Application for Fees and Expenses*, which included Aronson's and Russell's invoices for fees and expenses and included a list of expenses paid directly by Djourabchi and Welt, and showed payments of such fees and expenses that they had made.  Davenport did not object that if the paid fees and expenses were reasonable, he had not been given proper notice of their payment.  I will treat the *Application* as notice in compliance with the *Deed of Trust* of those payments and as requesting reimbursement.  Similarly, I will treat other invoices submitted as trial exhibits as giving notice of fees and expenses paid pursuant to those invoices and as requesting reimbursement.

To elaborate, the only exhibits in evidence reflecting notice are, first, the invoices issued to Djourabchi and Welt for Aronson's firm and Russell's firm and disclosed by way of their being attached to the *Application for Fees and Expenses* (Dkt. No. 137) filed on February 22, 2017, seeking the recovery of fees and expenses paid to those two firms and, second, the invoices issued to Djourabchi and Welt by McNamee Hosea that were received into evidence.  The first part of the McNamee Hosea statements received into evidence (ending with the statement as of December 31, 2017) was disclosed by way of Djourabchi and Welt's pretrial

statement filed on February 1, 2018, which listed as an Exhibit M

"Invoices for services by McNamee, Hosea, Jernigan, Kim, Greenan

& Lynch, P.A. through January 2018 (January invoice to be

provided when generated)."[69]  February 1, 2018, was the deadline

for exchanging listed exhibits.  A fair assumption is that as of

February 1, 2018, the first part of the McNamee Hosea statements

eventually received into evidence, those ending with the

statement as of December 31, 2018, had been provided to

Davenport's counsel.  The final McNamee Hosea statement received

into evidence was the statement dated February 13, 2018, and a

fair assumption is that this was provided to Davenport's counsel

on or before the pretrial conference on February 22, 2018.

Accordingly, I will treat Davenport as having been given notice

of the first set of McNamee Hosea statements on February 1, 2018,

and notice of the final McNamee Hosea statement on February 22,

2018.  For purposes of interest accruals on fees and expenses

paid, it is necessary to make an allocation of allowed fees and

expenses between the first invoices and the last invoice.  I

allocate $9,891.61 to the first invoices and $1,624.57 to the

---

[69]  At trial, Exhibit M included the McNamee Hosea statement
as of February 28, 2017.  Exhibit N included the rest of the
McNamee Hosea statements.  It is apparent that the February 28,
2017 statement should have been part of Exhibit N but
inadvertently was included as part of Exhibit M.

final invoice of February 13, 2018.[70]

To recapitulate, as to attorneys' fees and expenses incurred before February 13, 2018, the following are amounts for which Davenport has a reimbursement responsibility based on being given notice of their payment:

| | |
|---|---|
| General work of Aronson | $3,080.00 |
| Aronson and Russell's work on objection to claim | $3,796.00 |
| Aronson's payment of pro hac vice fee | $100.00 |
| Russell's expenses | $255.42 |
| Expenses Djourabchi and Welt paid directly | $3,975.39 |
| Work of McNamee Hosea on *Motion to Modify* | $1,310.79 |
| Expenses of McNamee Hosea | $374.44 |
| Work of McNamee Hosea on *Application for Fees and Expenses* | $9,830.95 |

Djourabchi and Welt are not entitled to reimbursement for any of the other fees for work performed prior to February 13, 2018, or

---

[70]   The McNamee Hosea statement as of February 13, 2018, was for $3,822.50 in fees and no expenses.  Of that $3,822.50 in fees, 25% is treated as relating to the *Motion to Modify* with 20% being allowed, *i.e.*, $191.13, and the remaining 75% is treated as related to the *Application for Fees and Expenses* with 50% being allowed, *i.e.*, $1,433.44.  So of the $11,516.18 total of recoverable fees and expenses, **$1,624.57** (the sum of $191.13 and $1,433.44) is treated as the recoverable amount attributable to the statement as of February 13, 2018.  The **$9,891.61** balance of the $11,516.18 is treated as attributable to the prior invoices.

for expenses paid prior to February 13, 2018, the date of the

last McNamee Hosea invoice in evidence.  This *Memorandum Decision*

does not address fees for work performed after February 13, 2018,

or expenses paid after that date.

Djourabchi and Welt made the following payments of allowed

fees and expenses and gave notice to Davenport of the payments of

allowed fees as follows:

| Category | Amounts of Fees and Expenses Allowed | Payments of Allowed Fees and Expenses Preceding Notice Date | Date of Notice to Davenport of the Payment |
|---|---|---|---|
| Aronson's and Russell's law firms | $7,231.42[71] | $7,231.42[72] | 02/22/2017 |
| Expenses paid by Djourabchi and Welt | $3,975.39 | $3,975.39 | 02/22/2017 |
| McNamee Hosea law firm through 12/31/2017 | $9,891.61[73] | $9,891.61[74] | 02/01/2018 |
| McNamee Hosea law firm for 01/01/2018 to 02/13/2018 | $1,624.57 | $1,624.57 | 02/22/2018 |

Accordingly, Davenport incurred a reimbursement obligation of

---

[71] This is the sum of the $3,080.00 for general work performed by Aronson; $3,796.00 for the work Aronson and Russell performed regarding the objection to claim; and $355.42 of expenses.

[72] Prior to February 22, 2017, a total of $10,000 had been paid to Aronson's law firm and $10,824.50 had been paid to Russell's law firm.

[73] See footnote 70, *supra*, regarding allocating allowed fees and expenses between the last invoice and the prior invoices.

[74] Payments of fees through December 31, 2017, totaled $22,904.49 ($22,962.00 of total payments of which $57.51 was applied to interest charged on a past due balance).

$11,206.81 as of February 22, 2017; a reimbursement obligation of
$9,891.61 as of February 1, 2018; and a reimbursement obligation
of $1,624.57 as of February 22, 2018.

VI

INTEREST ACCRUAL ON ATTORNEY'S FEES AND EXPENSES

What interest has accrued on the attorney's fees and
expenses?  Section 9 of the *Deed of Trust* provides:

> Any amounts disbursed by Lender under this Section 9
> shall become additional debt of Borrower secured by this
> Security Instrument.  These amounts shall bear interest
> at the Note rate from the date of disbursement and shall
> be payable, with such interest, upon notice from Lender
> to Borrower requesting payment.

Accordingly, under the *Deed of Trust* interest will be calculated
from the date of disbursement, but with notice to Davenport being
a condition precedent to his being liable for reimbursing
Djourabchi and Welt, such that (as explored in more detail below)
he ought not be responsible for interest until he was given
notice.

Interest accrues on the disbursements "at the Note rate."
The confirmation of the plan did not alter that interest on
postconfirmation obligations, and, accordingly, interest
continues to accrue at the *Note* rate of 10.5% per annum.
Although section 9 of the *Deed of Trust* says that interest runs
from the date of disbursement, Djourabchi and Welt were required

125

by section 9 to give notice to Davenport requesting payment of the expenses.  Interest should only run upon Davenport's being given notice.  If, for example, Djourabchi and Welt delayed for ten months to give Davenport notice of a disbursement, they ought not be entitled to collect interest at 10.5% per annum for the ten months after disbursement and preceding Davenport being given notice.

This follows because in every contract there exists an implied covenant of good faith and fair dealing, and a party ought not engage in "interfering with the other party's performance."  *Hais v. Smith*, 547 A.2d 986, 987–88 (D.C. 1988). This implied covenant excludes a variety of types of conduct characterized as involving "bad faith" because they violate standards of decency, fairness or reasonableness.  *Allworth v. Howard Univ.*, 890 A.2d 194, 201–02 (D.C. 2006).  There is an implied covenant in each contract that the parties will "extend reasonable cooperation" in clearing the way for performance. *Horlick v. Wright*, 104 A.2d 825, 827 (D.C. 1954).  *See also Aronoff v. Lenkin Co.*, 618 A.2d 669, 682 (D.C. 1992).  In other words, a party to a contract may be excused from full performance when the other party has failed to perform the essential condition precedent.  *See Minmar Builders, Inc. v. Beltway Excavators, Inc.*, 246 A.2d 784, 788 (D.C. 1968).

126

Here, Djourabchi and Welt's giving the required notice requesting reimbursement of an expense was a condition precedent to Davenport's obligation to make a reimbursement payment of the expense and interest thereon.  Davenport's full performance as to paying interest ought not apply when notice was a condition precedent to his being obligated to reimburse for the expense. Delay in giving notice would hinder Davenport in his reimbursing Djourabchi and Welt for the disbursement and in avoiding any substantial interest on the amount he was obligated to disburse. It would be unreasonable for Djourabchi and Welt to charge interest from the date of disbursement instead of the date of notice to Davenport.  Djourabchi and Welt had not amended their proof of claim to list **fees paid** (versus **fees incurred but not yet paid**), or filed a request for allowance of fees until, on February 22, 2017, they filed their *Application for Fees and Expenses* (Dkt. No. 137), which included the application for fees paid for Aronson's and Russell's work (plus fees that might be paid to McNamee Hosea).  Accordingly, interest is only due from the dates set forth in the table above of February 22, 2017 (for allowed amounts of $7,231.42 and $3,975.39); February 1, 2018 (for an allowed amount of $10,082.74); and February 13, 2018 (for $1,433.44).

127

VII

FEES AND EXPENSES INVOICED AFTER FEBRUARY 13, 2018, AND
FEES AND EXPENSES INCURRED IN THE DISTRICT COURT LITIGATION

In two regards, the court has not determined the extent of
Davenport's obligation to reimburse for fees and expenses
incurred by Djourabchi and Welt.  First, the trial of the *Motion
to Modify* addressed only the fees and expenses incurred by
Djourabchi and Welt as of February 13, 2020, the date of the last
McNamee Hosea invoice prior to the commencement of trial on
February 27, 2020.  Second, the court has found it premature to
decide whether Djourabchi and Welt will be entitled to be
reimbursed for payment of attorney's fees and expenses incurred
in the District Court litigation.  Accordingly, this decision
does not decide the question of the extent of any reimbursement
obligation with respect to those two sets of fees and expenses.

With the confirmed plan presumably being concluded, there is
no reason for this court to retain jurisdiction over that
question of Davenport's potential obligation to reimburse for any
fees and expenses incurred after February 13, 2018, or incurred
with respect to the District Court litigation.  The court will
abstain from addressing that question.  Obviously the abstention
as to that question does not constitute an adjudication of the
question.  This *Memorandum Decision* does not decide that question

128

but it may arguably have collateral estoppel effect (an issue not
addressed herein) and may have precedential value.

VIII

CONCLUSION

Appropriate orders follow.

[Signed and dated above.]

Copies to: Recipients of e-notification of filings.